60 N.J. Super. 240 (1960)
158 A.2d 706
WILLIAM BECKER, INDIVIDUALLY AND AS GUARDIAN AD LITEM OF ARLENE BECKER, AN INFANT, PLAINTIFF-APPELLANT,
v.
LESTER EISENSTODT, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted February 22, 1960.
Decided March 9, 1960.
*242 Before Judges GOLDMANN, CONFORD and FREUND.
Mr. William George, attorney for appellant (Mr. Frank G. Schlosser, of counsel).
Messrs. Braun & Hoey, attorneys for respondent (Mr. William P. Braun, of counsel).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiff, individually and as guardian ad litem of his daughter Arlene, now 19 years old, brought an action against defendant, a physician and surgeon, charging negligence in administering a caustic during post-operative treatment of Arlene following a rhinoplasty, thereby severely burning and disfiguring her. The Law Division judge granted defendant's motion to dismiss at the close of plaintiff's case, with prejudice, and plaintiff appeals.
Arlene went to see defendant in October 1957 because she wanted to have the shape of her nose changed to eliminate a bump. As a result of arrangements made by her parents, she entered a Newark hospital on December 19, 1957, where defendant performed a plastic operation on her without incident. There is no claim that the operation was not properly performed. She was discharged two days later, wearing bandages and a cast on her face and nose.
On December 23 Arlene, accompanied by her mother, went to the doctor's office for post-operative treatment, on which occasion he removed some of the bandages and cleaned her nose inside and out. At his direction she returned with her mother on December 27, at which time defendant took a pledget of cotton and with a tweezer dipped it into one of *243 the bottles standing on a nearby tray. He then pushed the liquid-saturated pledget all the way up Arlene's right nostril. When she complained that it hurt, the doctor said, "Don't be a baby; I have other people to take care of." Her mother was present during the entire incident. The two then went out into the reception room and sat down. The cotton pledget was still in Arlene's nose. The mother noticed that a silvery liquid ran down the girl's nostril and wet her upper lip. Arlene was suffering such severe pain that the receptionist took her inside to lie down. Defendant eventually appeared, helped the girl into his treatment room, removed the wet pack, and swabbed out the nostril with pieces of cotton coated with some substance. He then bandaged Arlene's face and sent her home with the direction to return the next day. Mrs. Becker drove her daughter home, but had to stop several times on the way because of Arlene's great pain.
The two returned to the doctor's office the next day. Both testified that when he removed the bandages the girl's nose and upper lip were swollen, the flesh raw and the skin coming off. The doctor did not explain what had happened, but treated the condition with salve. This treatment continued until about mid-February. By that time the right nostril had contracted so that it was almost closed. Arlene testified that on her last visit the doctor made a cut in her nostril and inserted a hard rubber object. She said that when she cried he told her to get out of his office. Pictures taken shortly after this show the right nostril almost closed, a vertical scar running from the nostril to the right upper lip, and the edge of the lip drawn upward where the scar met it. The appearance of the lip approximated that of a harelip.
After Arlene had testified at some length, plaintiff's counsel called defendant to the stand and asked him the following questions:
"Q. Doctor, on December 27, 1957, when Arlene Becker came to your office, you inserted into her nose, the right nostril of her nose, *244 a pledget or a piece of cotton saturated with a ten percent solution of cocaine? A. That's right, sir.
Q. And nothing else? A. That's right."
There was no cross-examination.
Plaintiff then called two medical experts: Dr. Ehrlich, an ear, nose and throat specialist for some 33 years, and Dr. Peer, practicing for 32 years and specializing in plastic and reconstruction surgery, including rhinoplasty and all surgery relating to the nose, interior and exterior.
Dr. Ehrlich saw Arlene December 29, 1957, two days after the incident complained of. He testified he saw an apparent burn due to a caustic and of recent origin, covering the whole circumference of the skin inside the right nostril and extending slightly upward to the mucous membrane of the nose, and vertically down the upper lip forming a quarter-inch-wide stripe to the lip, then slightly inside the mouth, and from there horizontally along the lip to the left side. The area was inflamed and denuded of epithelium, the skin having been burned away. He said that during his 33 years of practice he had often used a 10% solution of cocaine in the nostril, with and without surgery. Based on his experience, he said that such a solution could not have reasonably produced the condition he saw when he examined Arlene on December 29. The girl came to him for treatment on about a dozen occasions after the first visit. He said that the burns improved until they finally formed a firm scar, with a narrowing of the right nostril and with a thick scar pulling on the border of the upper lip.
Plaintiff's counsel then had Dr. Ehrlich insert a pledget, well saturated with a 10% solution of cocaine, into Arlene's nose in the presence of the jury. The solution ran from her nose down her lip. The pledget was allowed to remain in her nose for at least ten minutes. Arlene testified that the only sensation she experienced was a soothing one.
Dr. Peer testified that he first saw Arlene in his office on February 25, 1958, when he observed the scar condition just described. He received a history of a nasoplasty operation *245 performed by defendant, and of the insertion of the cotton pledget which Arlene and her mother thought contained a caustic and which resulted in a scarring of the lip and a narrowing of the right nostril. His examination confirmed that there was a burn, but he could not determine what had caused it. He said it could have been caused by a knife cut, a hot object, or by a chemical such as an acid or caustic. Asked whether a 10% solution of cocaine inserted in the nose could with any reasonable probability have caused the condition he observed, Dr. Peer answered that he had never seen that happen. He had used such a solution thousands of times on mucous membrane and skin during his years of practice. The only function of cocaine would be to deaden pain in the mucous membrane.
Dr. Peer had advised removal of the scar tissue and covering the defect with a skin graft taken from behind the girl's ear, to be followed later by a removal of the scar from the lip and a correction of the pull on its upper border. He operated on Arlene twice, on April 30 and September 7, 1958, and obtained a good result.
The trial judge granted defendant's motion to dismiss at the close of plaintiff's case on the ground that negligence had not been proved. He said that plaintiff, by calling defendant as a witness, established by his testimony that the solution used was, in fact, 10% cocaine. Since the demonstration before the jury of the harmlessness of such a solution showed that the procedure followed by defendant could not have had a detrimental effect upon Arlene, the trial judge concluded that calling upon defendant to proceed with his defense "could not materialize any greater proof by other or further explanation."
As we have already observed, the operation which defendant performed on Arlene's nose is not in issue. Nor is this a case in which plaintiff complains of the method used by the doctor in his post-operative treatment. He does not charge defendant with lack of professional skill, discretion or judgment, in which case the question of whether *246 the doctor followed standards recognized by the medical profession would be material. Toy v. Rickert, 53 N.J. Super. 27, 32 (App. Div. 1958); Carbone v. Warburton, 22 N.J. Super. 5, 10 (App. Div. 1952), affirmed 11 N.J. 418 (1953); Hull v. Plume, 131 N.J.L. 511, 514 (E. & A. 1944); 7 Wigmore on Evidence (3d ed. 1940), § 2090(a), p. 453. Rather, plaintiff charges that defendant negligently and carelessly used a caustic in treating Arlene's nose. This distinction is crucial, for it is the type of negligence which lay jurors can appreciate without the testimony of medical experts to describe the applicable standard of care. Steinke v. Bell, 32 N.J. Super. 67, 69 (App. Div. 1954); Carbone v. Warburton, above; Rogers, Expert Testimony (3d ed. 1941), § 165, p. 370; Wigmore, op. cit., § 2090(a), p. 453.
Plaintiff's medical experts were not called for the purpose of establishing a standard of care. What they did testify to was that the 10% cocaine solution which defendant said he administered could not, to their knowledge and in the light of their extensive experience, cause the injuries Arlene suffered, and that she had in fact sustained a burn of some kind. This is a medical error on which a layman is competent to pass judgment and conclude from common experience that such things do not happen if proper skill and care have been used. Prosser on Torts (2d ed. 1955), § 43, p. 210, citing such situations as a sponge left inside a patient's abdomen (see Niebel v. Winslow, 88 N.J.L. 191 (E. & A. 1915)), the removal or injury of an inappropriate part of the anatomy, dropping a tube down the windpipe, the inflicting of serious burns or, as in the Steinke case, above, removing the wrong tooth. Situations like these speak for themselves without the need of any expert testimony as to any departure from standards of care.
On defendant's motion for dismissal the facts and circumstances in evidence on plaintiff's case were to be taken as true and considered in a light most favorable to plaintiff, in accordance with established practice. The testimony of Dr. Ehrlich and Dr. Peer, added to that of Arlene and her *247 mother, justifies the inference that Arlene was burned by a chemical of a caustic nature, and that her injuries were not the consequence of an infection of some kind, as defendant implies. (Dr. Peer unequivocally testified that he had never seen a condition like Arlene's caused by an infection; and although Dr. Ehrlich on cross-examination said that an infection could destroy the epithelium, his opinion was clearly to the effect that Arlene had been burned by a caustic substance.) Thus, plaintiff's case was one within the field of legitimate inferences where a lay jury might properly conclude, from the established facts and in the absence of a satisfactory explanation by defendant, that he was negligent in moistening the pledget with a caustic liquid rather than the 10% cocaine solution which apparently would normally have been used for cleaning the inside of the nostril.
We conclude, therefore, that plaintiff established a prima facie showing of negligence. All he was required to do was to establish circumstances so strong that a jury might properly, on grounds of probability rather than certainty, exclude the inference favorable to defendant. Jackson v. D.L. & W.R.R. Co., 111 N.J.L. 487, 490 et seq. (E. & A. 1933).
In Loveland v. Nelson, 235 Mich. 623, 209 N.W. 835 (Sup. Ct. 1926), defendant dentist injected a supposed anesthetic fluid into plaintiff's gum. She experienced a burning sensation in her throat; the injection did not deaden the pain of extracting a tooth. Her face began to swell immediately. Pus accumulated. There was expert testimony from which the jury could have concluded that Lysol was injected into the gum. Defendant was in the habit of keeping his needle suspended in Lysol when not in use. The court held that negligence could be established by circumstantial evidence, and "where the circumstances are such as to take the case out of the realm of conjecture and within the field of legitimate inference from established facts * * * at least a prima facie case is made." Accordingly, the jury could properly conclude that defendant injected *248 Lysol, using a caustic instead of the intended anesthetic, and so the trial court had erred in taking the case away from the jury.
The sequence of events here seems equally as compelling as those in Loveland.
Respondent in his brief, like the trial judge in his oral ruling, places great stress on the fact that plaintiff called defendant as his own witness, and argues he is therefore bound by his testimony, citing Carluccio v. Winter, 108 N.J. Eq. 174 (E. & A. 1931), affirming per curiam what the vice-chancellor had said below; Veenstra & DeHaan Coal Co. v. Pepper, 125 N.J. Eq. 243 (Ch. 1938); and Rapczynski v. Eagle Investment Co., 12 N.J. Misc. 801 (Ch. 1934), which held, generally, that a party, by calling a witness, represents him to be worthy of some credit, and is therefore bound by his testimony.
Such a rule, so broadly stated, ill serves the cause of justice. It is a relic of the earliest system of trial, where those who attended on behalf of the parties were not witnesses, as we understand the word, but "oath-helpers," whose mere oath, when taken by the prescribed number of persons and in the proper form, determined the issue. Ordinarily, these persons were relatives and adherents of either party, clearly partisan. As Wigmore observes, so long as this traditional notion of a witness persisted, it was inconceivable that a party should gainsay his own witness. If a witness failed to swear for him, it was his loss  he should have chosen a better person for his purpose. Accordingly, a party was not allowed to dispute what his witness said. This "primitive" concept of the role of witnesses persisted long after the time when their function had ceased to be that of mere oath-taker and had become that of a testifier to the facts. 3 Wigmore on Evidence (3d ed. 1940), § 896, p. 383.
The author points out that the notion that a party is morally bound by what his witness says, no longer finds defenders. Ibid., § 897, p. 385. As early as 1811 Lord Chief Justice Ellenborough, in Alexander v. Gibson, 2 Camp. *249 555, observed that "If a witness is called on the part of the plaintiff, who swears what is palpably false, it would be extremely hard if the plaintiff's case should for that reason be sacrificed; but I know of no rule of law by which the truth is on such an occasion to be shut out and justice is to be perverted." Justice Putnam was of the same view. In Brown v. Bellows, 4 Pick., Mass., 179 [Rept. 187, 194] (1826), he held that a party was "not obliged to receive as unimpeached truth everything which a witness called by him may swear to. If his witness has been false or mistaken in his testimony, he may prove the truth by others." And in Whitaker v. Salisbury, 15 Pick., Mass. 534, 545 (Sup. Jud. Ct. 1834), he characterized the rule that a party is bound by his witness's statement as one that "would operate with great injustice * * *. No one would contend for a rule so inexpedient."
That the rule must yield to reason and common sense is effectively demonstrated in Wigmore's text, op. cit., §§ 897-899, pp. 385-390. He considers it as resting on no reason whatever, but upon mere tradition. Dealing specifically with a situation like ours, where one party calls the other as his witness, he observes:
"If there is any situation in which any semblance of reason disappears for the application of the rule against impeaching one's own witness, it is when the opposing party is himself called by the first party, and is sought to be compelled to disclose under oath that truth which he knows but is naturally unwilling to make known. To say that the first party guarantees the opponent's credibility * * * is to mock him with a false formula; he hopes that the opponent will speak truly, but he equally perceives the possibilities of the contrary, and he no more guarantees the other's credibility than he guarantees the truth of the other's case and the falsity of his own. To say, furthermore, that the first party, if he could impeach at will, holds the means of improperly coercing the other * * * is to proceed upon a singular interpretation of human nature and experience, and to attribute a power which the former may perhaps wish that he had but certainly cannot be clothed with by this or any other rule. There is therefore no reason why the rule should apply at all." (op. cit., § 916, p. 431 et seq., and citations to the text)
Accord: McCormick on Evidence, § 38, p. 71 (1954).
*250 The situation we are considering is, of course, to be distinguished from one where a party is permitted to neutralize unexpectedly adverse testimony given by his own witness, damaging to his case. There must be actual surprise. On accepted principles, a party so surprised may be permitted by the trial court, in the sound exercise of its legal discretion, to show that the witness had made prior statements inconsistent with, or contradictory of, the testimony presently given. State v. Caccavale, 58 N.J. Super. 560, 571-572 (App. Div. 1959), and cases cited; 3 Wigmore on Evidence (3d ed. 1940), §§ 902-905, p. 392 et seq., and New Jersey cases cited to § 905, n. 4, pp. 410-411, and 1959 Supp., p. 128; 58 Am. Jur., Witnesses, § 799, p. 444 (1948); 98 C.J.S., Witnesses, § 578(b)-(d), pp. 538 et seq. (1957).
Plaintiff advances as an alternate ground of appeal that his case should have gone to the jury under the res ipsa loquitur doctrine. The concept of res ipsa loquitur implies an absence of knowledge or information on the part of the plaintiff, through sources other than those within defendant's peculiar knowledge, as to what caused the injury. Where the rule applies, the case must go to the jury. The inference of negligence is exclusively one for it to draw, even in a case where the defendant does not come forward with an explanation. Bornstein v. Metropolitan Bottling Co., 26 N.J. 263, 269 et seq. (1958).
The situation in the present case was not one where plaintiff was required to rely exclusively upon the peculiar knowledge or information of defendant to explain how her injuries came about. She had  and presented  such a prima facie explanation, in that the objective circumstances were such that she was able to have her expert witnesses come forward and explain her injury as being the obvious result of a burn. She had no need to rely upon res ipsa loquitur.
Reversed and remanded for a new trial.