98 N.J. Super. 554 (1968)
237 A.2d 916
ELMER GOULD, PLAINTIFF,
v.
GERALD WINOKUR, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided January 12, 1968.
*557 Mr. Seymour B. Jacobs for plaintiff (Messrs. Balk & Jacobs, attorneys).
Mr. Arthur J. Blake for defendant (Messrs. Lamb, Blake, Hutchinson & Dunne, attorneys).
PINDAR, J.S.C.
The complaint herein alleged a cause of surgical and medical malpractice in three aspects, viz., negligent performance of surgery, failure to give plaintiff adequate information to procure his full consent, and failure to tender pre- and post-operative care. At the close of plaintiff's case the court granted defendant's motion for an involuntary *558 dismissal on the issue of surgical malpractice. At the end of the whole case the court submitted to the jury the issues of (a) informed consent  should defendant have informed his patient of all probable results short of death; (b) failure of pre- and post-operative care.
The jury returned a unanimous general verdict, accompanied by answers to interrogatories, R.R. 4:50: See Marchese v. Monaco, 52 N.J. Super. 474 (App. Div. 1958). The verdict was no cause for action. The answers to interrogatories are consistent with the general verdict.
The issues here presented came before the court on motion for a new trial, which claimed that either (a) the jury verdict was the result of passion, mistake, partiality or prejudice, or (b) the court made erroneous rulings of law and procedure at trial.
The pertinent facts are that plaintiff was suffering from unbearable pain due to a condition known as tic douloureaux. There is no known medical cause for this condition. To relieve the pain plaintiff underwent corrective surgery at the Neurological Institute of Columbia Presbyterian Hospital, New York, sometime in 1959. During that surgery, which was in the plaintiff's temple area, a sensory branch of the fifth cranial nerve was severed, with the result that plaintiff suffered both analgesia and anesthesia of the left face, as well as a deviation of the jaw to the left. For a time, at least, the pain was relieved. Subsequently, however, the pain recurred until it again became so unbearable that plaintiff consulted defendant Dr. Winokur, a specialist in neurosurgery, at his offices in Jersey City on February 18, 1964. There is a conflict in the testimony at this point, but the jury could have found that defendant informed plaintiff of the need for and effect of additional surgery, for which plaintiff was subsequently hospitalized in the Jersey City Medical Center when he signed a form of written consent for the contemplated surgery. It is undisputed that at some point plaintiff was told by defendant that he could die during or as a result of the contemplated surgery, which *559 was performed by defendant on March 16, 1964. The surgery consisted of a fifth nerve section, cerebellar craniotomy in the medial to mastoid area, during which a part of the occipital bone was removed. In the course of the operation a vein began to hemmorhage, which the jury could have found involved the seventh and eighth cranial nerves that are in close proximity to the fifth nerve. As a result of the involvement of the seventh and eighth nerves, plaintiff developed a left facial palsey, ataxia (loss of balance) and, eventually, loss of hearing in the left ear.
Defendant was called as plaintiff's first witness. During the course of plaintiff's examination defendant stated that involvement of the seventh and eighth nerves was not a probable sequence of events during a fifth nerve section of the type performed. Further, he testified that the only involvement of the seventh and eighth nerves which he had contemplated and anticipated prior to the operation was by visualization and not by damage. Furthermore, he testified that the accepted surgical standard for protection of the seventh and eighth nerves in an operation like the one in question was to cover the seventh and eighth nerves with thin, wet cottonoid strips  a standard which, he said, he had observed.
Plaintiff is now deaf in the left ear and blind in the left eye; suffers a total paralysis of the left facial muscles; has no feeling in his left eyeball or left cheek; can walk only with the assistance of a cane; his jaw deviates to the left; his tongue has no feeling on the left side, with the consequence that he has trouble eating. It seems clear that plaintiff will not be able to resume his trade as a dockbuilder and construction worker.
Concisely, plaintiff urged at the hearing of this motion that (1) a prospectively occurring snowstorm impeded deliberation by the jury; (2) the jury could not have reached a fair verdict in 60 minutes; (3) the court erred in granting the involuntary dismissal on the issue of surgical malpractice; (4) it erred in refusing to allow plaintiff to cross-examine *560 defendant on the question of surgical malpractice after the involuntary dismissal, and (5) it erred in refusing to charge res ipsa loquitur. Items 1 and 2 are related and will be considered together; similarly items 3, 4, and 5.
The case went to the jury on November 30, 1967 after 13 days of trial. On the morning of that day there were warnings of expected snow. Plaintiff urges that the jury's anxiety over reported weather conditions prevented it from properly discharging its duties, which consumed an approximate 60-minute time period before the verdict was returned. The court recollects that at 11 A.M., at which time the jury retired to deliberate, it was not snowing. Further, when the jury returned its verdict at approximately noon there were some snow flurries but not extensive. The court feels that it would be unjustified in concluding on the basis of this evidence, i.e., an adverse weather forecast, snow flurries and a 60-minute verdict, that the jury was so overcome with anxiety that a full and fair deliberation was impossible, and therefore a new trial should be granted. The evidence is simply insufficient and unconvincing. It is significant that upon return of the jury neither the related weather circumstance nor the time consumed was questioned.
For similar reasons plaintiff's contention that a 60-minute verdict after 13 days of trial and voluminous exhibits is convincing evidence of mistake, partiality or prejudice, or is against the weight of the evidence, must also be rejected. The court will concede, as contended by plaintiff, that it was obviously impossible for all jurors to have examined in detail each of the many documents they had in their possession. But the point is that the jury need not have examined them fully to arrive at a fair and impartial verdict. There was extensive examination by respective counsel on each of the salient features contained in the records by questioning the witnesses about them. Thus the jury had a sufficiently fresh recollection of those points to make a detailed personal inspection of them unnecessary. Particularly, *561 there was nothing contained in the records relevant to the question of informed consent that was of immediate concern to the jury, which, after the issue of surgical malpractice was excluded, was the stronger issue in plaintiff's favor. Without detailing all the evidence, suffice it to say that having reviewed the matter, the court further concludes that the jury's verdict on the submitted issues aforementioned was not against the weight of that evidence. Plaintiff's motion pursuant to R.R. 4:61-1 is, therefore, denied.
Considering plaintiff's contention that he was unduly prejudiced by the court's refusal to allow defendant to be cross-examined on the question of surgical malpractice, the court concludes that its ruling was correct and necessarily followed from the granting of defendant's motion for an involuntary dismissal on this issue when plaintiff rested his case. Plaintiff had the right to call, and did in fact call, defendant as a witness in his case. Having failed to elicit any information from the doctor at that time which would permit an inference that he was negligent in performing the operation, there was no useful purpose to be served by prolonging that line of questioning.
Plaintiff argues further that in a malpractice case the sole source of information is defendant himself. While that statement may or may not be correct, depending upon all the circumstances, it is not persuasive here because plaintiff conducted a thorough pretrial discovery. Defendant's depositions were taken and substantial portions were admitted in evidence over his objection at trial. R.R. 4:16-4; 4:16-5. Therefore, plaintiff was not unduly prejudiced, considering the pretrial discovery and the doctor's direct testimony on plaintiff's behalf.
While courts are generally reluctant, especially in malpractice cases, to grant involuntary dismissals  see Terhune v. Margaret Hague Maternity Hosp., 63 N.J. Super. 106 (App. Div. 1960)  where it is clear that plaintiff has not established a prima facie case, no purpose is served by prolonging his hope against hope. In this regard, since plaintiff *562 relies upon res ipsa loquitur as establishing a prima facie case, the court should point out that plaintiff's pretrial discovery plays no part in its later decision regarding the application of that doctrine in this case. See Menth v. Breeze Corp., Inc., 4 N.J. 428, 437 (1950). The court points this out in answer to defendant's statement that plaintiff could have and should have resorted to procedures provided by R.R. 4:25B. However, the voluntary nature of that procedure see Marsello v. Barnett, 50 N.J. 577 (1967)  makes it clear that plaintiff's failure to use it is not a factor to consider in ruling on the applicability of res ipsa loquitur, and it plays no part in the court's determination.
Considering the propriety of the ruling at trial, that plaintiff had not presented a prima facie case on the issue of negligence in the performance of the fifth nerve section, the court concludes that its ruling was correct and that defendant's motion for an involuntary dismissal was properly granted on this issue. As pointed out above, the primary basis upon which plaintiff rested was defendant's statement that the involvement of the seventh and eighth nerves was not a probable consequence of fifth nerve section in the occipital region. Plaintiff argued that because defendant himself said that it was improbable to have a seventh and eighth nerve involvement, there arose a permissible inference for the jury to the effect that defendant must have been negligent. The logic of this argument will be examined later. However, plaintiff claims, in effect, that this was a proper case for the invocation of the doctrine of res ipsa loquitur. Because this court feels that plaintiff raises a novel question, it will attempt to explain its conclusion at greater than ordinary length.
There are three elements traditionally cited by our courts as prerequisites to the application of res ipsa: (1) the occurrence must be one which ordinarily bespeaks negligence; (2) the instrumentality causing the injury must have been within defendant's exclusive control, and (3) there must be no indication that plaintiff's injury was in any way the *563 result of his own voluntary act or neglect. Bornstein v. Metropolitan Bottling Co., 26 N.J. 263, 269 (1958); see also Francis, J., concurring but elucidating the second requirement supra, at p. 275. On the element of exclusive control, see also Marzotto v. Gay Garment Co., 11 N.J. Super. 368 (App. Div. 1951), affirmed 7 N.J. 116 (1951). There is some conflict as to whether there is a fourth prerequisite  that knowledge of the actual facts be more accessible to defendant.
"The pragmatical rudiment of the legal presumption or inference of res ipsa loquitur is the circumstance that the causative facts of the anomalous accident are solely within the knowledge of the defendant and are not known to the plaintiff." Francisco v. Miller, 14 N.J. Super. 290, 295 (App. Div. 1951)
Bornstein v. Metropolitan Bottling Co., supra, 26 N.J., at p. 269. But see, Cleary v. City of Camden, 118 N.J.L. 215 (Sup. Ct. 1937), affirmed 119 N.J.L. 387 (E. & A. 1941); Klatt v. Hoboken Bank for Savings, 126 N.J.L. 96 (Sup. Ct. 1941); see also, 2 Harper & James, Torts, § 19.9, pp. 1094-1095.
Quite frankly, this court thinks accessibility of knowledge is irrelevant because it relates more to the justice of a new rule of law based upon strict liability rather than to traditional notions of liability based upon fault, which notions have not yet explicitly been rejected in New Jersey. Compare Salgo v. Leland Stanford Jr. University Board of Trustees, 154 Cal. App.2d 560, 317 P.2d 170 (App. Ct. 1957). Therefore, plaintiff errs by urging that the doctrine be applied in this case solely because he was unconscious at the time the malpractice, if any, occurred. Furthermore, applying the doctrine to this case in order to flush out an explanation might be entirely futile, because the effect of applying res ipsa loquitur in New Jersey is simply to recognize a permissible inference which the jury may or may not draw. Were the doctrine to be applied, there would be no legal requirement which would force a defendant to offer *564 an explanation; the burden of proof would remain with plaintiff. Absent an explanation, a plaintiff would not be entitled to a directed verdict, nor, if the jury refused to draw the inference, could a jury verdict of no cause be set aside. This, of course, is not to minimize the doctrine's practical effect, for it may very well shift the burden of persuasion. Furthermore, it will establish a prima facie case and so withstand defendant's motion for an involuntary dismissal, or, if the jury draws the inference, a motion for judgment notwithstanding the verdict. See Kahalili v. Rosecliff Realty Inc., 26 N.J. 595 (1958); Wildauer v. Rudnevitz, 119 N.J.L. 471 (E. & A. 1937); Hughes v. Atlantic City, etc., R.R. Co., 85 N.J.L. 212 (E. & A. 1913). Compare for the effect in California, Bruce v. United States, 167 F. Supp. 579 (D.C. Cal. 1958).
It is for reasons similar to those stated above that the court also rejects plaintiff's argument that res ipsa loquitur should apply to this case because of the so-called "conspiracy of silence." If plaintiff's proofs do not conform to the enumerated prerequisites of res ipsa loquitur, perhaps with modifications (as shall later be examined), it is illogical to argue that the doctrine should nonetheless be applied because plaintiff is unable to secure a competent expert to testify regarding defendant's alleged negligence. This conclusion reasonably follows from a consideration of the fact that the "conspiracy of silence" does not qualify an expert to testify beyond his field of competency. Carbone v. Warburton, 11 N.J. 418, 428 (1953); Lewis v. Read, 80 N.J. Super. 148, 168 (App. Div. 1963). In short, an expert is either qualified or he is not, just as plaintiff's proof either meets the prerequisites of res ipsa or does not. The "conspiracy of silence" is irrelevant to these points.
Thus far we have assumed that the doctrine of res ipsa loquitur is potentially applicable to a medical malpractice case. The assumption is warranted by language to be found in a number of cases. See e.g., Sanzari v. Rosenfeld, 34 N.J. 128 (1961); Hull v. Plume, 131 N.J.L. 511 *565 (E. & A. 1944); Renrick v. City of Newark, 74 N.J. Super. 200 (App. Div. 1962); Terhune v. Margaret Hague Maternity Hosp., 63 N.J. Super. 106 (App. Div. 1960); Becker v. Eisenstodt, 60 N.J. Super. 240 (App. Div. 1960); Toy v. Rickert, 53 N.J. Super. 27 (App. Div. 1958); Carbone v. Warburton, 22 N.J. Super. 5 (App. Div. 1952), affirmed 11 N.J. 418 (1953). Compare Steinke v. Bell, 32 N.J. Super. 67 (App. Div. 1954). However, it is interesting to note that in none of the cases cited above, nor in any other New Jersey medical malpractice case disclosed by research, has the res ipsa loquitur doctrine been successfully employed by name. There may be several reasons for this, but one reason is surely a peculiarly New Jersey doctrine. Reference is made to the "common knowledge" doctrine, as articulated by the Supreme Court in Sanzari v. Rosenfeld, supra, 34 N.J., at pp. 141-142. Paraphrasing, the difference between the two doctrines is the difference between a res ipsa case and a case of "pure" negligence, i.e., whereas in a strict res ipsa case the jury is called upon to supply by permissible inference the negligent act or omission, as well as the standard by which to judge the quality of the act or omission, in a "common knowledge" case the negligent act or omission is proved, either directly or circumstantially, and the jury supplies the standard by which the act or omission is judged. The "common knowledge" doctrine, and not res ipsa, is therefore, in New Jersey, the category within which one must group cases like Steinke v. Bell, supra, and, more clearly, Becker v. Eisenstodt, supra, and Sanzari v. Rosenfeld, supra. Therefore, plaintiff misplaces his reliance on Steinke and Becker as precedents for invoking res ipsa loquitur in this malpractice case, although the court concedes that the facts related in Steinke seem to pose a res ipsa situation in that the negligent act was not clearly proved, as the court's language in Steinke indicates when it says the tooth was either "extracted or caused to come out," Id., 32 N.J. Super., at p. 68, thus implying that the jury was left not only to supply the standard but to infer the negligent act as well.
*566 Since plaintiff relies, not on the "common knowledge" doctrine, but rather on the res ipsa doctrine, the subsequent inquiry will be suitably restricted to an examination of res ipsa's meaning in a medical malpractice context. It would seem that when the New Jersey cases speak of res ipsa they contemplate a very exclusive class of fact patterns. Invariably the cases say that the doctrine will apply, without the aid of expert witnesses, "where the asserted negligence consists of conduct so obviously wanting in reasonable medical skill and prudence that it may be adjudged even by a layman * * *." Terhune v. Margaret Hague Maternity Hosp., supra, 63 N.J. Super., at p. 111. Such verbal formulations are useful only insofar as they indicate that there are cases wherein the doctrine will be applied in New Jersey. However, since there are no New Jersey cases, one must look to the digests to imagine the kinds of cases the courts have in mind. One useful distinction has been drawn, i.e., res ipsa loquitur is more likely to be applied in those cases in which injuries result to healthy or unaffected areas not within the general anatomical location of treatment. 162 A.L.R. 1265; 82 A.L.R.2d 1262. See Ayers v. Parry, 192 F.2d 181 (3 Cir. 1951); certiorari denied 343 U.S. 980, 72 S.Ct. 1081, 96 L.Ed. 1371 (1952), rehearing denied 344 U.S. 849, 73 S.Ct. 49, 97 L.Ed. 660 (1952), 344 U.S. 916, 73 S.Ct. 337, 97 L.Ed. 707 (1953), 345 U.S. 961, 73 S.Ct. 941, 97 L.Ed. 1381 (1953). The basis of the distinction is the assumption that the jury knows from its common experience the proper medical standard, or otherwise that such knowledge is unnecessary, e.g., where a patient's arm is injured during an appendectomy. Ybarra v. Spangard, 25 Cal.2d 486, 154 P.2d 687, 162 A.L.R. 1258 (Sup. Ct. 1944). But the distinction is not foolproof and there are cases where injury has been to healthy tissue outside the area of treatment and res ipsa has not been applied, e.g., Toy v. Rickert, supra, wherein the court cited the imponderables of a hypodermic injection in the buttocks, resulting in paralysis. But see Wolfsmith v. *567 Marsh, 51 Cal.2d 832, 337 P.2d 70, 82 A.L.R.2d 1257 (Sup. Ct. 1959). We take it that it is not within the common knowledge or experience of laymen to say in this case that an involvement of the seventh and eighth nerves, which are less than 1/4-inch away from the fifth nerve, is more probably than not a result of a deviation from the accepted surgical standards of procedure. This case is not, therefore, one which New Jersey has heretofore considered a proper res ipsa case.
The remaining question for the court's consideration is whether New Jersey would permit expert testimony to lay the foundation for submission of this case to the jury with a res ipsa charge. No New Jersey case seems to have considered this point. Consider, however, the implications of Becker v. Eisenstodt, supra. Prosser assumes that "even where such a basis of common knowledge is lacking, however, expert testimony may provide a sufficient foundation" for a res ipsa charge. Prosser, Torts (3d Ed. 1964), § 39, p. 221. See also Fricke, "The Use of Expert Evidence in Res Ipsa Loquitur Cases," 5 Villanova L. Rev. 59 (1959); Note, 106 U. Pa. L. Rev. 731 (1958). On the need for expert testimony generally, see 141 A.L.R. 5 and 81 A.L.R.2d 597. Among the cases which permit expert testimony to lay a foundation for res ipsa are Seneris v. Haas, 45 Cal.2d 811, 291 P.2d 915, 53 A.L.R.2d 124 (Sup. Ct. 1955); Fehrman v. Smirl, 20 Wis.2d 1, 121 N.W.2d 255 (Sup. Ct. 1963), rehearing denied 20 Wis.2d 1, 122 N.W.2d 439 (Sup. Ct. 1963), verdict for plaintiff on retrial affirmed, 25 Wis.2d 645, 131 N.W.2d 314 (Sup. Ct. 1964); Walker v. Distler, 78 Idaho 38, 296 P.2d 452 (Sup. Ct. 1956). It is apparently a minority rule, however enlightened. Note, U. Pa. L. Rev., supra, at p. 747. Furthermore, courts across the country are not rapidly adopting the res ipsa doctrine in medical malpractice cases. Note, 60 Mich L. Rev. 1153 (1962).
However, assuming that New Jersey would allow expert testimony to lay a foundation for res ipsa in cases where *568 the jury does not possess the requisite knowledge  a question which our appellate courts must answer  it remains to be seen whether plaintiff has laid the proper foundation in this case. It should be noted here in passing that whereas the court thinks a patient's unconscious state and the "conspiracy of silence" are irrelevant considerations for deciding whether res ipsa should be applied, as pointed out above, they are at least relevant if not convincing arguments for the adoption of a rule allowing expert testimony to lay the proper foundation, because, when the testimony is given in the proper form, no violence is done to the prevailing fault bases of liability, and adoption of such a rule might alleviate some of the hardships plaintiffs so often complain of in cases of this type. However, the court emphasizes the fact that it is not within its prerogative to decide this point.
Nonetheless, plaintiff has not laid the proper foundation in this case. He relies upon defendant's statement that a seventh and eighth nerve involvement during a fifth nerve section was improbable. But as the California Supreme Court has pointed out in Silverson v. Weber, 57 Cal.2d 834, 22 Cal. Rptr. 337, 372 P.2d 97 (1962), "the fact that a particular injury suffered by a patient as a result of an operation is something that rarely occurs does not of itself prove that the injury was probably caused by the negligence of those in charge of the operation." (22 Cal. Rptr., at p. 339, 372 P.2d, at p. 99). In other words, to say that an accident rarely occurs in a given type of operation is not to say that when an accident does occur it is a result of the doctor's deviation from accepted surgical or medical standards. In such a case the poor result is not evidence of negligence. See Young v. Stevens, 132 N.J.L. 124, 130 (E. & A. 1944). The question one has to have answered in order to lay a proper foundation for a res ipsa case is: "Is such an accident as we have here more often than not due to negligent conduct on the part of those in charge?" Fricke, op. cit., at p. 61. This question directs the attention of the jury and judge, not to the total range of experience *569 in a given area, but rather to those occasions when accidents do in fact occur. Id., at p. 60. Such information must be obtained as a minimum requirement before the court can allow itself or the jury to make the "sheerest leap of faith." 2 Harper & James, Torts § 19.5, p. 1078. The court does not mean to suggest that asking the question in the form quoted is the exclusive means by which to lay a proper foundation; it is simply the clearest form. Plaintiff, having failed to have this question answered in the affirmative, has failed to make out a prima facie case.
For the foregoing reasons, the court stands by its trial rulings and finds no basis for either setting aside the jury's verdict or for granting a new trial.