STENA S. STEVENS, Personal Representative of the Estate of Rose D. Stanley v. BARRY R. BARNHART ET AL.

[No. 889, September Term, 1979.]

*Decided April 11, 1980.*

The cause was argued before GILBERT, C. J., and MORTON and THOMPSON, JJ.

*Samuel D. Hill,* with whom were *White, Mindel, Clarke & Hill* on the brief, for appellant.

*M. Natalie McSherry,* with whom were *William B. Whiteford, Harry S. Johnson* and *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellees.

MORTON, J., delivered the opinion of the Court.

The appellant, as personal representative of the estate of her mother, Rose D. Stanley, brought suit in the Circuit Court for Cecil County against Dr. Barry R. Barnhart and Dr. Jay S. Barnhart, Jr., appellees, charging them with medical malpractice in the course of their treatment of Mrs. Stanley while she was a patient in Union Hospital from September 20, 1974, until her discharge on October 9, 1974. The case was tried before a jury (Mackey, J., presiding) and the jury rendered a verdict in favor of appellees.

The record reveals that Mrs. Stanley was admitted to Union Hospital because of injuries she sustained in a fall. Her regular doctor, Dr. Cuza, was not available and she then became a patient of the appellees. They continued her on medicine previously prescribed by Dr. Cuza except that they changed the high blood pressure medicine from butazerpizide to butazide. The latter contained a combination of two of the three drugs making up the former. They also prescribed neosporin, an ointment to be applied to the abrasions she suffered in the fall.

Some ten days after her admission to the hospital she developed a rash and an itching sensation over much of her body which was described by Dr. Jay Barnhart as "severe generalized erythematous rash, especially on the back where she has many self-inflicted excoriations which are bleeding. This rash looks like a contact dermatitis and may be due to the neosporin ointment."

The application of neosporin to the abrased area on her arm was stopped. Thereafter the progress notes indicate that she was treated for the rash and that the rash condition seemed to have improved. Mrs. Stanley was released from

the hospital on October 9, 1974. She was given a thirty day supply of high blood pressure medicine and told to make a follow up visit to the Barnharts' office at the end of ten days.

When the rash did not subside, she entered the University of Pennsylvania Hospital on October 14, 1974. She was placed under the care of Dr. Leyden. He testified that he suspected the rash was a result of a drug reaction and took her off all drugs, including butazide, and treated her with other medication. Her condition seemed to improve and she was discharged from the hospital on November 15, 1974.

The rash did not continue to improve and she entered The Johns Hopkins Hospital for her skin problem on July 2, 1975, and stayed there until July 28, 1975. Later she was admitted to Union Hospital where she died on August 29, 1975, from causes not related to the skin condition.

At trial the appellant called as an expert witness Dr. Norton Herring, a surgeon practicing in California. He testified that in his opinion good medical judgment would have called for the suspension of all medications upon discovering the rash and not just the neosporin ointment. He also stated that the blood pressure medicine probably caused the rash and that if it had been discontinued immediately, the rash should have been ninety percent cured by the time Mrs. Stanley left the Union Hospital on October 9, 1974. He said that although all the medicines were stopped at the University of Pennsylvania Hospital, her reaction by that time had become irreversible.

Dr. Leyden, who treated Mrs. Stanley at the University of Pennsylvania Hospital, said that the best way to ascertain what drug was causing the rash was to cease all medication and then reinstitute them one at a time to see which one was causing the reaction. He thought butazide was the most likely culprit and that is why he ordered Mrs. Stanley off it. He agreed that if the rash started where the neosporin was applied and that the rash condition improved when it was not applied, it was not unreasonable to suspect that the rash was caused by the neosporin.

Dr. Lanzi was called by the defense as an expert witness

and testified that he agreed with the conclusions and treatment accorded Mrs. Stanley by the appellees. It was his opinion that their conduct "did conform with the medical standards of this community as I would have practiced medicine."

The appellant first contends that the trial judge erred in not compelling the appellees to furnish the appellant with the names of the doctors they consulted with as experts in preparing for trial, but who were not going to be called as witnesses. The appellant concedes that "[i]t might be argued that the decision of the Court of Appeals in *Wagonheim v. Md. State Bd. of Censors,* 255 Md. 297, 309 . . . is dispositive, or that Md. Rule 400 d and f by implication precludes discovery of experts consulted but not to be called as witnesses." It is argued, however, that "there should be a distinction made between the ordinary case and a malpractice case" because of a "conspiracy of silence." While we are not entirely clear what the term means and although there may have been a time when doctors seemingly were reluctant to testify against each other in a malpractice case, we decline to take judicial notice that such a "conspiracy" exists today.

In *Wagonheim,* the Court of Appeals said:

> "In the instant case the appellants requested not only the names of the actual witnesses which the State proposed to use at the hearing, but all of the individuals who may have been requested by the State to view the film for the possible purpose of being used as a witness, or for consultation with the State concerning the obscene aspects of the film. We do not think that discovery in civil cases as promulgated by Maryland Rule 417 goes to that which is in essence the work product of the attorney accumulated in the preparation of the case." 255 Md. 309.

We agree with the argument that *Wagonheim* is dispositive of appellant's first contention.

For the same reason we find no merit in appellant's second contention that "[t]he Court erred in refusing to allow the Plaintiff's attorney to question the Defendant Jay [Barnhart] before the jury about the doctors with whom he conferred about the Defendants' alleged malpractice."

It appears that at the voir dire stage of the trial nine prospective jurors from the entire panel of some thirty jurors advised the court that they were patients of Dr. Lanzi and another juror knew him as a fellow church member. Each of the ten jurors was asked if that fact would prevent him or her from rendering a fair and impartial verdict based solely on the evidence and each responded that it would not. The trial judge thereupon overruled appellant's motion that these jurors be stricken for cause. The jury was then selected and it turned out that of the twelve seated and the alternate, four were patients of Dr. Lanzi and one was a fellow church goer.

After Dr. Lanzi completed his testimony, appellant moved for a mistrial because of alleged prejudice suffered as a result of the five jurors' relationship to Dr. Lanzi. The same alleged prejudice formed the basis of the appellant's motion for a new trial which was filed after the jury's verdict. Appellant raised the issues separately, but suggests that they be treated together. We agree.

Appellant recognizes that "[a] surface glance at the law applicable without delving deeper might lead this Court to conclude that the Trial Judge was correct in not striking these jurors for cause, when they said that their relationship with Dr. Lanzi would not prejudice their decision." But if we give more than a surface glance and delve deeper into the applicable law, the trial judge cannot be faulted for refusing to strike these jurors for cause. In *Borman v. State,* 1 Md. App. 276 (1967), this Court stated, at 279:

> "The purpose of the voir dire examination is to ascertain the existence of cause for disqualification and for no other purpose. *Giles v. State,* 229 Md. 370 (1962). Neither mere acquaintance with an individual or group, nor mere relationship to

witnesses, other than parties, is sufficient basis for challenging a prospective juror for cause. *Goldstein v. State,* 220 Md. 39 (1959). Bias on the part of prospective jurors will never be presumed, and the challenging party bears the burden of presenting facts, in addition to mere relationship or association, which would give rise to a showing of actual prejudice. See *Bristow v. State,* 242 Md. 283 (1966)."

On the other hand, we did hold in *Tisdale v. State,* 30 Md. App. 334 (1976), that the trial judge committed reversible error when he refused to strike for cause two jurors who admitted on voir dire that they would give more weight to the testimony of a police officer merely because he was a police officer. With refreshing candor appellant's appellate counsel suggests that "[p]erhaps, the Plaintiff's attorney should have requested a more precise statement by the Trial Judge of Dr. Lanzi's actual position in the case, except that it was known then only that he was a possible witness for the Defendants." Conceivably, a deeper probing of the jurors' relationship with Dr. Lanzi would have demonstrated a reason to strike them for cause. The magic question propounded in *Tisdale* was simply not asked the jurors here. Thus, this case does not come to us in the factual posture of *Tisdale.* Accordingly, we think the refusal of the trial judge to strike these jurors for cause does not mount up to reversible error. We cannot subscribe to the argument that "the relationship of the jurors to Dr. Lanzi was sufficient in itself in this case to show a predisposition to attach greater credence to his testimony regardless of the assurance to the Court of the contrary."

We find no merit in the appellant's seventh contention that "[t]he Trial Court erred in refusing to advise Dr. Lanzi that he might well be violating his duty to a patient of his partnership by testifying as an expert for the Defendants against the interest of the Plaintiff's deceased or to allow the Plaintiff's attorney to do so or question Dr. Lanzi about that before the jury." The basis for this contention is an

allegation that a partner of Dr. Lanzi treated Mrs. Stanley in 1974 for an ailment unrelated to her rash, which was the basis for this suit. Dr. Lanzi testified that he did not know that Mrs. Stanley had been a patient of his partner. In support of the contention appellant sets forth the following quotation from *Green v. Otenasek,* 267 Md. 9, 16 (1972):

> " ' "We are of the opinion that members of a profession, especially the medical profession, stand in a confidential or fiduciary capacity as to their patients. They owe their patients more than just medical care for which payment is exacted; there is a duty of total care; that includes and comprehends a duty to aid the patient in litigation, to render reports when necessary and to attend court when needed. That further includes a duty to refuse affirmative assistance to the patient's antagonist in litigation . . . ." ' "

The above statement is a quotation from *Hammonds v. Aetna Casualty & Surety Company,* 243 F. Supp. 793, 799 (N.D. Ohio, 1965), which in turn is a quotation from *Alexander v. Knight,* 177 A.2d 142, 146 (Sup. Ct. Pa. 1962). The Court of Appeals set forth the quotation from these cases because the appellants in *Green* "relied upon [those] two cases for support of their position . . . ." The Court of Appeals went on to say: "We agree that neither of these cases is apposite and what might be quoted in each case as favorable to appellants hardly rises to the level of dicta."

In any event, we do not believe the above statement represents the law of Maryland. In *Franklin v. State,* 8 Md. App. 134, 141 (1969), *cert. denied,* 257 Md. 733, Chief Judge Murphy, speaking for this Court, stated:

> "Communications made to a physician in his professional capacity are not privileged under the common law of Maryland, nor, with some exceptions in the case of psychiatrists, have they been made so by statute. *See Robinson v. State,* 249

Md. 200, 221; *O'Brien v. State,* 126 Md. 270, 284; *Leszynski v. Russ,* 29 F.R.D. 10 (D.C. Md.)."

Until the Court of Appeals holds otherwise, this represents the law of Maryland. Accordingly, we find no error in the trial judge's refusal to advise Dr. Lanzi as requested by appellant's counsel, or in his refusal to permit counsel to question Dr. Lanzi before the jury concerning the relationship.

Finally, the appellant contends that "[t]he Court erred in overruling the Plaintiff's Motion to limit the transcript to a statement of the case plus transcript of the proceedings on voir dire and out of the presence of the jury." We agree with the appellant's assertion that it is desirable to submit a case to the appellate court on an agreed statement of the case as provided in Maryland Rule 1026 e whenever possible. We are not prepared, however, to use this appeal as a vehicle to chastise either appellees' counsel for opposing the appellant's motion or the trial court for denying the motion.

*Judgment affirmed; costs to be paid by appellant.*