The sole issue presented in this medical malpractice case is whether the trial court erred in refusing to allow the plaintiff's expert witness to testify on redirect examination concerning an alleged "conspiracy of silence" among physicians. We affirm.
Ricky Trull, as administrator of his deceased wife's estate, sued Dr. Robert T.L. Long, Dr. Long's professional association, various other physicians, the Lauderdale County Hospital board, and the City of Florence, alleging medical malpractice. Trull alleged that Dr. Long had negligently treated his wife for Guillain-Barré disease and had negligently performed a tracheostomy. Also, in the same action, Trull sued Bivona, Inc., alleging products liability for marketing an allegedly defective endotracheal tube.
The trial court dismissed all defendants except Dr. Long and his professional association. Before trial, Dr. Long filed a motion in limine asking the court to prohibit the plaintiff from referring to, or discussing in any way, any alleged "conspiracy of silence" among physicians. The trial court granted Dr. Long's motion in limine.
During cross-examination of Trull's expert, Dr. Mills, the defense established that Dr. Mills had given deposition testimony 52 times in medical malpractice cases, had testified 13 times in medical malpractice cases, had testified 3 times in arbitration proceedings related to medical malpractice claims, had testified numerous other times for Trull's attorney on behalf of other plaintiffs, charged $250 an hour to review the records on potential claims, and accepted referrals from associations of professional expert witnesses. After cross-examination, Trull asked the court to allow redirect testimony concerning the alleged "conspiracy of silence," so as to explain why Dr. Mills testified so often. The court refused to allow the requested redirect testimony.
The court submitted the case to the jury and the jury returned a verdict for the defendants. Thereafter, Trull moved for a *Page 1279 
new trial. The court denied that motion. Trull appeals.[1]
Initially, we note that the alleged "conspiracy of silence" has received much critical comment. Furthermore, commentators have readily recognized the alleged "conspiracy" as fact. See, e.g., Joan Vogel and Richard Delgado, To Tell The Truth:Physicians' Duty To Disclose Medical Mistakes, 28 U.C.L.A.L.Rev. 52 (1988) (urging courts to adopt a positive legal duty requiring physicians to report their own and other physicians' mistakes to patients and a corresponding cause of action for failure to disclose); Rickee N. Arntz, Comment,Competency of Medical Expert Witnesses: Standards andQualifications, 24 Creighton L.Rev. 1359, 1379 (1991) (discussing the conspiracy of silence" problem, particularly the problem of explaining to the jury why the plaintiff's expert is not a local physician); Joseph Kelner, The SilentDoctors — The Conspiracy of Silence, 5 U.Rich.L.Rev. 119 (1970-71) (an interesting discussion of the alleged "conspiracy of silence"); Melton Kelner, The Medical Conspiracy of Silence, 87 Case Comment 10 (July-August 1982) (defining the "conspiracy" as "the unwritten code of non-criticism . . . imprinted on the doctor throughout his or her entire period of training" and discussing the consequences of a local doctor's testifying against another local doctor); Richard M. Markus,Conspiracy of Silence, 14 Cleve.Marsh.L.Rev. 520 (1965) (discussing three possible causes for the alleged "conspiracy": physicians' fears of financial and professional ruin, defense attorneys' encouraging local doctors not to talk with counsel for plaintiffs, and legal rules, such as that requiring expert testimony in medical malpractice cases and the locality rule); David E. Seidelson, Medical Malpractice Cases and the ReluctantExpert, 16 Cath.U.L.Rev. 158 (1966) (discussing the "conspiracy" problem and suggesting four alternative ways of securing a medical expert: using interprofessional panels to review potential claims, using the "learned treatise" rule, using state statutes that authorize courts to appoint medical experts, and using the trial court's inherent power to appoint experts and provide for their compensation); Note, Overcomingthe "Conspiracy of Silence": Statutory and Common-LawInnovations, 45 Minn.L.Rev. 1019 (1961) (discussing the "conspiracy" and suggesting use of learned treatises and medical brochures as means of overcoming its effect).
One scholar's comments are typical of the general tenor of the literature:
 "It has been held to be a matter of common knowledge that a plaintiff in a medical malpractice action often is unable to find a medical expert willing to testify against a fellow physician, and that this fact creates the possibility of 'great miscarriages of justice.' This tendency of physicians to refrain from testifying against one another has been referred to as the 'conspiracy of silence.' It has been said this phenomenon has developed for any, or all, of the following reasons; (1) physicians believe their colleagues are often found liable when not negligent; (2) they think jurors are ill-equipped to scrutinize medical technicalities; (3) physicians fear the 'wrath' of attorneys on cross-examination; (4) they are obviously sympathetic with the defendant-physician, knowing that even competent physicians are subject to malpractice suits; and (5) the medical profession, as well as the malpractice insurance carriers, discourages such testimony.
". . . .
 "And it has been held that the natural result of such conspiracy, a trial in which many witnesses testify on behalf of the defendant-physician and few on behalf of the plaintiff, should not be considered by an appellate court in deciding whether the evidence supported a verdict for the malpractice plaintiff."
David M. Harney, Medical Malpractice § 5.1 at 193, 195 (1973 
Supp. 1980) (Emphasis supplied).[2] *Page 1280 
Courts, however, have been far more reluctant than commentators to embrace and recognize the alleged "conspiracy of silence." A review of our sister states' case law in point reveals that, while courts have discussed the alleged "conspiracy" in various contexts and on numerous occasions, they have been reluctant, generally, to recognize the "conspiracy."
Numerous courts have mentioned the possibility of the "conspiracy" existing as a reason to abrogate or change the "locality rule." See, e.g., Morrison v. MacNamara,407 A.2d 555, 563 n. 7 (D.C. 1979); Hansbrough v. Kosyak,141 Ill. App.3d 538, 95 Ill.Dec. 708, 712, 490 N.E.2d 181,185 (1986); Bartimus v. Paxton Community Hosp.,120 Ill. App.3d 1060, 76 Ill.Dec. 418, 423, 458 N.E.2d 1072,1077 (1983); Ardoin v. Hartford Acc. Indem. Co., 360 So.2d 1331,1337 (La. 1978); and Orcutt v. Miller, 95 Nev. 408, 595 P.2d 1191,1194 (1979). Other courts have discussed the alleged "conspiracy" in deciding whether their states' versions of "informed consent" should require expert testimony. See, e.g., Cooper v. Roberts,220 Pa. Super. 260, 286 A.2d 647, 650 (1971); and Hunter v.Brown, 4 Wn. App. 899, 484 P.2d 1162, 1165 (1971). Still other courts have discussed the "conspiracy" problem when parties have argued that, because of the alleged "conspiracy," the doctrine of res ipsa loquitur should apply to their case. See, e.g., Gould v. Winokur, 98 N.J. Super. 554,237 A.2d 916, 921 (1968); Jones v. Harrisburg Polyclinic Hosp., 496 Pa. 465, 437 A.2d 1134, 1138 (1981); and Irick v. Andrew,545 S.W.2d 557, 559 (Tex.Civ.App. 1981). Additionally, courts have mentioned the alleged "conspiracy" in stating or reiterating a rule advising trial courts to exercise extreme caution in entering a summary judgment against a medical malpractice plaintiff, Buck v. Alton Memorial Hosp., 86 Ill. App.3d 347, 41 Ill.Dec. 569, 585, 407 N.E.2d 1067, 1083 (1980); Goffe v.Pharmaseal Laboratories, Inc., 90 N.M. 764, 568 P.2d 600, 607
(Ct.App. 1976) (Sutin, J., concurring in part, dissenting in part); in rejecting an argument that the trial court found the plaintiff's expert competent based largely on the alleged "conspiracy," Lewis v. Read, 80 N.J. Super. 148, 193 A.2d 255,266 (1963); in rejecting the trial court's allowing the plaintiff to treat the defense's expert witness as hostile when called by the plaintiff during direct examination, Reams v.Stutler, 642 S.W.2d 586, 588 (Ky. 1982); and in rejecting a plaintiff's argument that the trial court should have compelled the defendants to reveal their expert witnesses that were not to be called at trial, Stevens v. Barnhart, 45 Md. App. 289,412 A.2d 1292, 1294 (1980).
Several of our sister states either flatly reject or seriously doubt the notion that any "conspiracy of silence" exists among physicians. For example, in Clark v. Norris,226 Mont. 43, 734 P.2d 182, 187 (1977), the court found no error in the trial court's refusal to take judicial notice of the alleged "conspiracy of silence," noting that "Whether or not there is a conspiracy of silence in the medical community is a subject of considerable debate."
In Farley v. Meadows, 185 W. Va. 48, 404 S.E.2d 537, 539-40
(1991), the court stated:
 "Ms. Farley had ample time to retain an expert, and failed to do so. She claims that there is a 'conspiracy of silence' among medical professionals, and, of course, there is an understandable reluctance among doctors to testify against fellow doctors with whom they must work every day. However, it is obvious from the abundance of medical malpractice cases that go to trial around the United States, and from the profusion of medical experts advertising their services in the back of legal magazines, that many doctors will gladly don their boxing gloves for a reasonable *Page 1281 fee and testify about malpractice matters away from their own home towns."
(Emphasis supplied.)
In Hitch v. Hall, 42 Md. App. 260, 399 A.2d 953, 959 (1979), the court stated:
 "We see no error in the cross-examination permitted, nor do we find any error in the court's refusal to permit appellant's counsel to present evidence of the existence of a conspiracy of silence. We do not understand counsel's complaint of a conspiracy of silence as . . . three local doctors were secured to testify as experts. We think the trial judge wisely exercised her discretion in refusing an in-depth interrogation of the alleged conspiracy of silence in view of the circumstances of this case."
(Emphasis supplied.)
Other of our sister states apparently require proof in the record that the alleged "conspiracy" exists and that it adversely affected the plaintiff's ability to obtain an expert witness in his particular case. For example, in Thibodeaux v.Aetna Cas. Sur. Co., 216 So.2d 314, 317 (La. 1968), the court stated, "As to the allegation of a conspiracy of silence, this court can do naught but consider the record as it is, and in this record we find no evidence of such conspiracy." See also,Ogletree v. Willis-Knighton Memorial Hosp., 530 So.2d 1175,1180 (La.App. 1988), and Maxey v. Hubble, 238 Va. 607,385 S.E.2d 593, 597 (1989).
This Court addressed a "conspiracy of silence" problem inBatizy v. Smith, 530 So.2d 794 (Ala. 1988). The issue in Batizy
was whether the trial court erred in denying a new trial; the plaintiff contended that the court had erroneously sustained an objection to the plaintiff's rebuttal question "Tell the jury what the conspiracy of silence is." In affirming, we stated:
 "It is within the discretion of the trial court, however, to allow or disallow testimony on rebuttal. The court did not abuse its discretion here; further testimony on any 'conspiracy of silence' by doctors not to testify against each other could have been excluded here on any of several grounds. For one thing, the mention of it by Dr. Abramson was in a non-responsive answer and, for another, he adequately presented his view that people who needed expert medical testimony 'frequently couldn't get it.' Evidence of such a 'conspiracy of silence' would not be inherently admissible, and it was Mr. Batizy's witness who self-servingly introduced it. Thus, Dr. Smith did not open the door to such evidence, but rather, the succeeding questions responded to Dr. Abramson's mention of the phrase."
Batizy, 530 So.2d at 796. (Emphasis supplied; citations omitted.)
Here, Trull argues that the defense's cross-examination of Dr. Mills interjected into the trial new matters that he was entitled to address on redirect examination. Basically, Trull argues that Dr. Mills was discredited on cross-examination and that he was entitled to explain why Dr. Mills gave so many depositions and testified so often in medical malpractice actions and was associated with an expert witness referral association. Also, Trull argues that Batizy does not preclude testimony regarding the alleged "conspiracy of silence" on redirect, but that it merely disallows direct evidence on the subject in a plaintiff's case-in-chief.
On the other hand, Dr. Long asserts that Batizy controls. Stressing the "[e]vidence of such a 'conspiracy of silence' would not be inherently admissible" language in Batizy, Dr. Long argues that Batizy makes testimony concerning the alleged "conspiracy of silence" inherently inadmissible in medical malpractice cases.
We are inclined to disagree with Dr. Long. InBatizy, this Court did sustain the trial judge's ruling, but this Court did not intend to hold that evidence of a "conspiracy of silence" would be inherently inadmissible, underall circumstances. In fact, in Batizy, we specifically noted that the trial judge did not abuse his discretion to refuse to permit the testimony in that case.
We hold here that the trial court did not abuse its discretion in refusing to permit the witness to testify about a "conspiracy *Page 1282 
of silence" on the ground that this record fails to show that a proper predicate was laid for the admission of evidence relating to the alleged "conspiracy of silence." As the Louisiana Court of Appeal said in Thibodeaux v. Aetna Cas. Sur. Co., "As to the allegation of a conspiracy of silence, this court can do naught but consider the record as it is, and in this record we find no evidence of such a conspiracy."[3]216 So.2d at 317.
Based on the foregoing, the judgment of the trial court is due to be affirmed.
AFFIRMED.
HORNSBY, C.J., and HOUSTON, J., concur.
SHORES, ADAMS and STEAGALL, JJ., concur specially.
[1] Trull does not appeal the judgment as to the professional association.
[2] See also, W. Page Keeton, et al., Prosser and Keeton on Torts, § 32 at p. 188 (5th ed. 1984), wherein the authors describe the alleged "conspiracy of silence" as:
 "The well known reluctance of doctors to testify against one another, which has been mentioned now and then in the decisions, may make this [expert testimony on behalf of the plaintiff] difficult or impossible to obtain, especially in a jurisdiction with a narrow locality rule, and so in some instances effectively deprive the plaintiff of any remedy for a real and grievous wrong."
[3] It should be remembered also that Alabama recognizes several exceptions to the expert testimony rule, such as the common knowledge exception (see, e.g., Parrish v. Spink, 284 Ala. 263,224 So.2d 621 (1969), and Lloyd Noland Foundation, Inc. v.Harris, 295 Ala. 63, 322 So.2d 709 (1975)), res ipsa loquitur (see, e.g., Sellers v. Noah, 209 Ala. 103, 95 So. 167 (1923),Powell v. Mullins, 479 So.2d 1119 (Ala. 1985), appeal after remand, 523 So.2d 393 (Ala. 1988), and Ravi v. Williams,536 So.2d 1374 (Ala. 1988)), and the learned treatise rule (see, e.g., Stoudenmier v. Williamson, 29 Ala. 558 (1857), Zills v.Brown, 382 So.2d 528 (Ala. 1980), and Powell v. Mullins,479 So.2d 1119, appeal after remand, 523 So.2d 393 (1985)). See, also, Charles Gamble, McElroy's Alabama Evidence § 258.01 (4th ed. 1991)). To the extent that the alleged "conspiracy" is factually accurate, these exceptions would aid the plaintiff in circumventing the "conspiracy."