## GREEN ET UX. *v.* OTENASEK

[No. 63, September Term, 1972.]

*Decided November 13, 1972.*

The cause was argued before MURPHY, C. J., and BARNES, SINGLEY, SMITH and LEVINE, JJ.

*Jerome A. Dashner* for appellants.

*Thomas D. Washburne,* with whom were *Robert R. Winter* and *M. King Hill, Jr.,* on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court.

This appeal arises out of a rather unique case tried before a jury presided over by Judge Rasin in the Baltimore City Court. One of the appellants, Vernon D. Green (Green), his wife, Cleda M. Green, being the other, was injured as a passenger in an automobile collision on January 26, 1965, while he was on duty as a sergeant on the Vice Squad of the Baltimore City Police Department. Claiming that he sustained substantial injuries, they filed

suit in the Baltimore City Court on March 30, 1966, through their attorney, David J. Preller, Esq. (Preller), against the two drivers of the respective vehicles involved in the collision, Smith and Toth.[1] Toth's defense was undertaken by his insurance carrier, Hartford Accident Insurance Company, through John F. King, Esq. (King).

In the course of being treated for his injuries, Green came under the care of appellee (Otenasek) who is a physician specializing in neurological surgery. Ultimately, the case against the drivers reached the point of being ready for trial. To prepare for that eventuality, Preller arranged to confer with Otenasek at the latter's office in October, 1968. During that conference, which, for the most part, was apparently harmonious, there was a thorough discussion of Green's condition as reflected by the several medical reports which had previously been furnished Preller by Otenasek. The meeting, however, terminated on a less conciliatory note when Otenasek announced that he would not attend the trial of the case due to a long-standing policy against appearing in court. According to Preller, Otenasek stated he would not appear even if served with a witness subpoena. Otenasek claimed that he informed Preller of his intention not to testify because counsel allegedly had promised that if the doctor conferred with him, a trial appearance would be unnecessary.

Following that meeting, there ensued an exchange of correspondence between them which began with Preller's payment of a fee for the consultation, and which was punctuated by Preller's entreaties and Otenasek's reasons for refusing. Throughout the correspondence, Preller stressed the importance of Otenasek's testimony to appellant. Preller also advised appellee by his letter of February 27, 1969 that the case was set for trial on

---

1. Although it is of no significance here, the Declaration was subsequently amended to add as a defendant the Maryland Department of Health, owner of the vehicle driven by Toth, and also his employer.

April 30, and offered to accommodate the doctor's schedule and to pay him a witness fee. Appellee's reply of March 6 bears repeating here:

> "I think I have gone very far out of my way to give you all the information in the case of Mr. Vernon D. Green. In my interview with you I told you that I would not appear in court and my letter of January 6, 1969, confirms this.

> "You can, of course, 'force' me to appear but since this is against my policy I would have to declare to the Court that I am appearing under coercion and therefore, subject to the prejudices and vagaries of human psychology. I think, therefore, that it would be to your interest not to call me into Court."

In anticipation of the April 30 trial date, Preller issued a witness subpoena for appellee which a deputy sheriff tried valiantly to serve several times. When those efforts proved to be futile, the sheriff, having been "given a complete run around," left the subpoena with an office employee. Return was made with the notation "SD" which the parties stipulated was the sheriff's indication that the witness had been summoned. However, the case was not reached for trial on April 30 due to a previously-granted continuance occasioned by illness of counsel.

Not long thereafter, the suit was settled for the total sum of $52,500,[2] without a trial, and with no further effort made to serve appellee with a subpoena for a new date. According to Otenasek, Preller wrote to him on July 31st informing him of the settlement with the suggestion that the case was being settled for half its value due to appellee's alleged refusal to "attend several trial dates."

Thereafter, the Greens sued Otenasek for damages in tort alleging that as a result of appellee's refusal to tes-

---

2. Green's principal complaint regarding injuries allegedly sustained in the collision was a disc protruding from the fourth lumbar interspace which appellee removed surgically.

tify as a witness for them in the case against Smith and Toth, they were compelled to settle the case out of court "for a fraction of its actual monetary value, and suffered a substantial loss." During the trial, appellants called as one of their witnesses, Dr. Carl F. Christ, Professor of Economics at the Johns Hopkins University, for the purpose of proving Green's economic loss occasioned by his automobile injuries and his consequential retirement from the police force.[3] After a rather extensive proffer of what Dr. Christ's testimony would be, the court ruled that the assumptions on which the proposed testimony was to be grounded were too speculative and, in effect, disallowed his entire testimony.

At the end of appellants' case, the court reserved appellee's motion for a directed verdict, but denied it at the conclusion of the entire case. The case was submitted to the jury on the following special issues:

"1. Do you find that the sum of $52,500.00 was a fair and reasonable settlement for the injuries, losses and damages sustained by Mr. and Mrs. Green as a result of the accident of January 26, 1965?

"2. If you find the answer to Issue No. 1 is 'NO,' then what amount do you find would have been fair and reasonable compensation for the injuries, losses and damages sustained by Mr. and Mrs. Green as a result of the accident of January 26, 1965?

"3. Was Dr. Frank Otenasek's conduct with respect to offering medical evidence in the prior case the direct and proximate cause of the settlement of that case?"

The jury answered the first issue "yes," thereby making consideration of the remaining issues unnecessary. From the judgment on that verdict, this appeal is taken.

The sole question presented by appellants is whether

---

3. It appears that the decision to call Mr. Christ arose out of appellants' intention to call two distinguished former members of the Supreme Bench now practicing law, for the purpose of establishing what the value of appellants' case would have been if appellee had testified in a trial, and the trial judge's ruling that the appellants could not proceed on that basis, but would be required to present their damages in the same manner as if there had been a trial instead of a settlement.

the trial judge abused his discretion in refusing to admit the testimony regarding economic loss. We find it unnecessary to decide the point raised by appellants as any error in the evidentiary ruling, if there was error, was not prejudicial. We reach this conclusion since we are of the view that Judge Rasin should have granted appellee's motion for directed verdict made at the end of the entire case. In so concluding, we have not been unmindful of the general rule by which the sufficiency of the evidence is to be tested when this Court is reviewing a motion for a directed verdict as being, that we must resolve all conflicts in the evidence in favor of appellants and must assume the truth of all evidence and inferences as may naturally and legitimately be deduced therefrom which tend to support appellants' right to recover. *Lloyd v. Bowles,* 260 Md. 568, 273 A. 2d 193 (1971) ; *Smith v. Bernfeld,* 226 Md. 400, 405, 174 A. 2d 53 (1961) ; *Zeamer v. Reeves,* 225 Md. 526, 530, 171 A. 2d 488 (1961) ; *Campbell v. Jenifer,* 222 Md. 106, 110, 159 A. 2d 353 (1960).

Appellee's motion for a directed verdict, while resting on a number of overlapping grounds, raised the following points which we now regard as determinative of this appeal. They are:

1. That the appellee was not served with a subpoena to appear in any court for a trial which actually took place, and there was no evidence that appellee refused or failed to respond to a lawful summons, subpoena or order of court for his attendance at trial.

2. That appellants elected their remedy by voluntarily settling their case for personal injuries.

3. That appellants failed to prove that appellee would not have appeared and that he would not have testified honestly under oath with regard to his medical findings and opinions if served with a subpoena for a trial which actually occurred.

Any consideration of the issues presented here must begin with a recognition of Maryland Code (1957, 1969

Repl. Vol.), Article 35, § 14, in effect at all times material to this case: [4]

> "Whenever any witness shall be summoned to attend any of the courts of this State and shall, without sufficient excuse, neglect to appear, he may be attached and fined by the court not exceeding fifty dollars, and shall be liable to answer the party for whom he shall be summoned *in an action upon the case for the damage sustained* for want of his appearance to testify according to such summons." (emphasis added)

Similar statutes are found in most other states. See 8 Wigmore, *Evidence*, § 2195f (McNaughton Rev. 1961).

The difficulty which becomes immediately apparent here stems from the fact that this suit has been brought against a witness who was not served with a summons, and thus does not come within the ambit of the statute. For this proposition, there is, to say the least, a lack of case authority as we suggested at the outset of this opinion. Indeed, no American case dealing with the precise factual situation present here has been brought to our attention, nor have we found any.

Appellee suggests in his brief that in the trial court at oral argument on the demurrer and motion for summary judgment filed by appellee, in both of which the issue we deal with here was raised, appellants relied upon two cases for support of their position, *Hammonds v. Aetna Casualty & Surety Company*, 243 F. Supp. 793 (N.D. Ohio 1965) and *Alexander v. Knight*, 197 Pa. Super. 79, 177 A. 2d 142 (1962). We agree that neither of these cases is apposite and what might be quoted in each case as favorable to appellants hardly rises to the level of dicta. For example, in *Hammonds, supra,* the action was brought by a personal injury victim against an insurance company for allegedly persuading the plaintiff's treating physician, by the use of a false pretext, to di-

---

4. The language of § 14 quoted herein remains intact in the 1971 Replacement Volume.

vulge confidential information gained through the physician-patient relationship. That the court denied summary judgment for the carrier in the face of such an allegation should hardly cause a tremor and understandably, in the context of that record, the court would be moved to say:

> "It cannot be questioned that part of a doctor's duty of total care requires him to offer his medical testimony on behalf of his patient if the patient becomes involved in litigation over the injury or illness which the doctor treated . . . ." 243 F. Supp. at 799.

The court also quoted with approval from *Alexander v. Knight, supra,* in which the facts were somewhat similar in that it involved a physician charged with inducing a fellow-doctor to breach his duty of secrecy and to surrender pertinent information to the defense without first gaining the plaintiff's permission:

> " 'We are of the opinion that members of a profession, especially the medical profession, stand in a confidential or fiduciary capacity as to their patients. They owe their patients more than just medical care for which payment is exacted; there is a duty of total care; *that includes and comprehends a duty to aid the patient in litigation, to render reports when necessary and to attend court when needed.* That further includes a duty to refuse affirmative assistance to the patient's antagonist in litigation . . . ." *Id.* at 799 (emphasis added).

We find nothing in either of the above-quoted cases which supports appellants' cause of action.

Two other American cases, *Griffith v. Harris,* 17 Wis. 2d 255, 116 N.W.2d 133 (1962) and *Church v. Payne,* 35 Cal.App.2d 752, 92 P. 2d 406 (1939), cited here by appellee, merit scant attention. In *Griffith, supra,* plaintiffs in a medical malpractice case sued two physicians for damages for breach of contract under which the phy-

sicians allegedly agreed to testify as expert medical witnesses. When the malpractice case came on for trial, the two physicians informed the plaintiff's attorney that they "would not testify without a subpoena and, if subpoenaed, they would not testify in any way that would benefit the plaintiff." They were not subpoenaed and did not appear to testify in behalf of the plaintiff, as a consequence of which the malpractice action was *dismissed* at the end of the plaintiff's case. A demurrer to the complaint was sustained and that ruling was upheld on appeal, the court noting that:

> "The plaintiff [did] not claim that his loss was occasioned merely by the doctors' failure to attend the trial. The complaint is not couched in terms of the burden and expense caused by the doctors' breach of an obligation to attend. On the contrary, it is their failure to give *favorable* medical evidence to establish an alleged malpractice which has prompted the plaintiff's claim that the defendants caused the plaintiff to lose his lawsuit." 116 N.W.2d at 135 (emphasis in original).

Although suggesting that a litigant and a prospective witness may lawfully contract for an appearance of the latter, the breach of which might give rise to an award of damages, the court held that an agreement to testify in a certain manner, i.e., "favorably for the plaintiff[,]" was against public policy, and hence was unenforceable. Clearly, *Griffith,* apart from the result which was reached, is distinguishable since there, at least, the litigant proceeded to trial and suffered a final dismissal of his case.

In *Church v. Payne, supra,* an action was brought seeking a penalty and damages under the California statute which was a counterpart to § 14 of Article 35. Since, there, the absent witness disobeyed a subpoena served upon him, the case is clearly distinguishable on what is undoubtedly the controlling fact in the case at bar.

It is something of an anomaly that the only two cases coming to our attention which can be said to more nearly approach the issues before us are two English cases, one of which is a bit musty, but nonetheless instructive. They are *Roberts v. J. & F. Stone Lighting and Radio, Limited,* 172 L. T. R. 240 (K. B. 1945) and *Mullett v. Hunt,* 1 Exch. (Cromton & Messon) 752 (1833). *Roberts* is cited by appellee in his brief and our attention is drawn to *Mullett* by the thoroughly-considered opinion written by Judge Howard in the Baltimore City Court in ruling upon appellee's demurrer.

*Mullett* involved an action for trespass on the case by a litigant against his witness for the latter's failure to appear as a witness. One of the points decided there is noteworthy. It was claimed by the witness that there was insufficient evidence of the service of the subpoena as had been alleged in the declaration. However, the court noted that while not apparently served in the technical sense, the subpoena had been "shewn" and thus this was sufficient for it to have been "made known and served," as was required. Thus, the witness had knowledge of the action for which the subpoena had been issued.

While we confess to being somewhat fascinated by the change of pace one experiences in reading *Mullett,* we decline to follow it as we find it distinguishable in two material respects. First, the trial date here, for which appellee was summoned, was never reached due to the continuance and no effort was ever made to issue a subpoena again, much less serve it upon the appellee. Secondly, the claim in *Mullett* was merely for costs and expenses incurred in prosecuting the case prior to the "withdrawal of the record," and damages for the resulting delay in ultimately trying the case, whereas here appellants, having opted for a settlement rather than "call" appellee's threat, seek substantial damages which they have said, in effect, would equal the amount of the settlement.

We find *Roberts, supra,* more apposite than *Mullett,* even if less fascinating due largely to the demise of "Old

English" in the 112-year interval. There, the witness failed to appear after being served with a subpoena despite a promise by the company employing both the witness and the litigant to furnish the evidence.[5] The litigant then claimed that he was compelled to "compromise for a smaller sum than he would have recovered if the action had gone forward with the missing witness present." Notwithstanding the failure to obey the subpoena, a clearcut violation of the English counterpart to § 14 of Article 35, the witness prevailed since the court concluded that the plaintiff failed to prove damages, i.e., that he would have recovered more than the settlement amount if the witness had appeared. In so holding, the court underscored the uncertainty of whether the plaintiff would have prevailed in any event.

While appellee has not challenged the likelihood that appellants would have prevailed on the issue of liability in a trial against Smith and Toth, there is merit in the analogy to *Roberts* that the appellants' medical witness might not have survived as handsomely at trial as they have assumed he would since settling their case.

Apart from the fact that appellee disobeyed no process, it is also important to note that appellee's veiled threat should not have been accepted as conclusive. While we do not wish to be understood as applauding a refusal to testify, it should not have been assumed that appellee, his professional status aside, would have defied a subpoena. But even if he had, the means available for insuring his presence, without regard to § 14, Article 35, are too apparent to dwell upon here.

Moreover, insofar as the statement in appellee's letter of March 6 can be interpreted as a threatened "loss of memory," there are methods for handling such situations, especially where, as here, the "blow is telegraphed," such as by seeking appropriate instructions *in limine* from the trial judge. Nor could the appellants seriously have allowed themselves to be intimidated by a sugges-

---

5. The evidence which was involved consisted of work records to support a loss-of-earnings claim.

tion that appellee meant to testify falsely if compelled to appear. Ordinarily, a witness is presumed to speak the truth, 98 C.J.S., *Witnesses*, § 459, perhaps because the sanctions for perjury usually serve as an effective deterrent. Furthermore, any apprehension in this regard, again, could have been alleviated by taking the matter up in advance out of the presence of the jury.

It is also significant here that the record is devoid of any evidence that either King or the insurance carrier knew of the plight in which appellants claim to have been, and King's testimony is to the contrary. Thus, there is nothing to show or imply that appellee's medical reports were less instrumental in contributing to the amount of settlement than they would have been in the absence of his threatened "refusal" to testify.

Finally, while we recognize that it is usually preferable for serious personal injuries to be presented *viva voce* by the treating physician, appellants might have bolstered their stance by deposing appellee in his office, as he has suggested, if for no other reason than to learn more precisely what he meant by the "prejudices and vagaries of human psychology."

We hold that in the circumstances presented here, there can be no cause of action *ex delicto* for damages against appellee.

> *Judgment affirmed; appellants to pay costs.*