774 A.2d 1209

**Charlotte BUTLER–TULIO**

**v.**

**Carlton Henry SCROGGINS, M.D., et al.**

**No. 1478, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

June 29, 2001.

124

128

Marc A. Greidinger, Springfield, VA, for appellant.

Eric Rhoades (Armstrong, Donohue, Ceppos & Vaughan, Chartered, on the brief), Rockville, for appellee, Scroggins.

Alan R. Siciliano, Lanham, for appellee, Prince George's Hosp. Center.

Argued before DEBORAH S. EYLER, KRAUSER, and JOHN J. BISHOP, Jr. (Retired, specially assigned), JJ.

KRAUSER, Judge.

Appellant, Charlotte Butler–Tulio, brought this medical malpractice action in the Circuit Court for Prince George's County against appellees, Carlton Henry Scroggins, M.D. and the Prince George's Hospital Center, for allegedly leaving part of a microsurgical needle in her wrist during an operation to repair a transected median nerve.[1] After the jury returned a verdict in favor of appellees, appellant noted this appeal, challenging the admissibility of the testimony of appellees' expert witness, Ronald William Luethke, M.D., and the propriety of certain jury instructions given by the trial court. Those two issues are now presented to us in the form of five questions:[2]

I. Did the trial court err in permitting Ronald William Luethke, M.D., to testify as an expert witness for appellees, over appellant's objection, although he had originally been consulted by appellant for a medical evaluation and possible treatment?

II. Did the trial court err in instructing the jury on intervening and superseding cause?

---

**1.** The "median nerve" is located in the forearm. W.B. SAUNDERS COMPANY, HARCOURT BRACE & COMPANY, DORLAND'S *ILLUSTRATED* MEDICAL DICTIONARY 1123 (28th ed.1994); "transected" is defined as "a cutting made across a long axis." AM.JUR.3D SERIES, *Proof of Facts*, TABER'S CYCLOPEDIC MEDICAL DICTIONARY 1759 (Clayton L. Thomas, ed., 15th ed.1985).

**2.** To aid our analysis, we have reworded and reordered the questions presented by appellant but have otherwise left them substantively intact.

III. Did the trial court err in stating, during the course of instructing the jury on the applicable standard of care, that "[t]here is a presumption that health care providers perform their medical duties with the requisite care and skill?"

IV. Did the trial court err in failing to instruct the jury on the doctrine of *res ipsa loquitur?*

V. Did the trial court err in failing to instruct the jury as to the "borrowed servant" or "captain of the ship" doctrines?

For the reasons that follow, we shall affirm the judgment of the trial court.

## BACKGROUND

On August 19, 1991, appellant accidentally cut the wrist of her right arm while she was performing a household chore. She subsequently sought medical attention at appellee Prince George's Hospital Center. There, the cut was sutured in appellee's emergency room.

When appellant continued to experience pain and numbness in her right hand, she was referred to appellee, Carlton Henry Scroggins, M.D. After examining appellant, Dr. Scroggins concluded that she had suffered an injury to the median nerve, and scheduled her for surgery.

On September 12, 1991, Dr. Scroggins performed surgery on appellant's wrist at Prince George's Hospital Center. On the median nerve, he found a neuroma, a nodule made up of nerve and scar tissue, and removed it. During that operation, he was assisted by another surgeon, a scrub technician, and two circulating nurses.

The nurses were employees of Prince George's Hospital Center. Among other things, they were responsible for counting the needles and recording whether the count was "correct" on the "Operation Room Data Form." During appellant's operation, two counts were performed and recorded as "correct" on that form.

Following surgery, appellant continued to complain of pain. Dr. Scroggins referred her to the Raymond Curtis Hand Center at Union Memorial Hospital ("Union Memorial"). At Union Memorial, on December 15, 1992, Clara Belle Wheeler, M.D., performed another surgery on appellant's wrist. In her operative notes, Dr. Wheeler indicated that she found "a shiny object ... lying over the tendinous portion of the palmaris longus [3] as it splayed into the palmar fascia." [4] Under loupe [5] magnification, Dr. Wheeler identified the object as a "surgical suture needle." The surgical pathology report identified the same object as a "metallic splinter," which was six-tenths of a centimeter in length and less than one-tenth of a centimeter in diameter.

On January 12, 1995, appellant was examined by Ronald William Luethke, M.D., a plastic surgeon. Appellant told Dr. Luethke that she had cut her hand on a piece of glass in 1991, and that Dr. Scroggins had performed surgery a few weeks after the injury. She complained of weakness in her hand, abnormal sensations in her thumb and fingers, and difficulty in bending her hand back. After examining appellant's hand and wrist, Dr. Luethke concluded that appellant was suffering from a "low median nerve injury," but advised against further surgery. Instead, he recommended only symptomatic treatment.

At the end of the examination, appellant asked Dr. Luethke if he "could support her claim of negligence" against appellees. In reply, Dr. Luethke stated that "the presence of a small microsurgical needle in the wound in the area where it was described ... would have little, if any effect, on her current

---

**3.** The "palmaris longus" is a muscle that "flexes [the] wrist joint." W.B. SAUNDERS COMPANY, HARCOURT BRACE & COMPANY, DORLAND'S *ILLUSTRATED MEDICAL DICTIONARY* 1080 (28th ed., 1994).

**4.** "Palmar fascia" are "bundles of fibrous tissue radiating toward the bases of the fingers from the tendon of the palmaris longus muscle." *Id.* at 107.

**5.** "Loupe" is defined as "a convex lens for low magnification of minute objects at very close range." *Id.* at 960.

disability or treatment with regards to her previous injuries." He further advised her that he "could not support her claim of negligence" but "would be happy to see her back should she desire further consultation and treatment." Appellant did not see Dr. Luethke again.

Two years later, on January 10, 1997, appellant filed a complaint in the Circuit Court for Prince George's County against Dr. Scroggins and the Prince George's Hospital Center, alleging, among other things, that appellees were negligent in leaving a foreign object in her wrist during surgery.

## Trial

At trial, appellant called two expert witnesses: Joseph Anthony Mead, Jr., M.D. and Carol M. Mennich, R.N. Dr. Mead opined that Dr. Scroggins had violated the standard of care owed appellant by leaving "a needle or part of the needle" in the wound, by later failing to discover that "the needle part" had been left there, and by failing to recognize that that was the cause of appellant's continued pain and disability.

Dr. Mead further testified that, in his opinion, the "needle" left in the wound was the cause of appellant's "pain and injury." But he declined to express an opinion as to how a part of that needle had broken off or how it had found its way into the wound site. Moreover, he declined to state that Dr. Scroggins was responsible for breaking the needle in the first place.

Appellant's other expert witness was Carol Mennich, a registered nurse. She testified that needle counts were performed during appellant's surgery at Prince George's Hospital Center, and that those counts were the responsibility of the operating room nurses. The purpose of such counts, according to Mennich, is to "insure there are no foreign objects left in the body cavity." She opined that the nurses, who assisted Dr. Scroggins, failed to properly account for the needles because they indicated twice on the operating room data form

that the needle count was correct when a portion of one of the needles was missing.

Appellees' expert witness was Dr. Luethke, the plastic surgeon consulted by appellant two years earlier. Dr. Luethke had not been named as either a fact or expert witness by appellant.

After describing his examination of appellant, Dr. Luethke testified that leaving a microsurgical needle in the wound is not a violation of the standard of care, and that it "[i]n fact ... happens all the time." He further opined that there are "many ways ... a microsurgical needle could ... find its way into an operative wound by no fault of anyone's." According to Dr. Luethke, "[t]he needle was found well away from the area of the previous median nerve repair," and, the metallic sliver or microsurgical needle had "nothing to do" with appellant's injury or the pain in her wrist and hand.

He further stated that, at the conclusion of her examination, appellant had asked him whether he could support her claim of negligence. In response, Dr. Luethke stated that he could not as there was no evidence that either appellee had "breach[ed] the standard of care." When defense counsel asked Dr. Luethke why he thought appellant had come to see him, Dr. Luethke responded that he "came away [from the consultation] with the distinct impression that [appellant] was hoping for someone or a physician to support her claim of negligence."

When the trial ended, the jury returned a verdict in favor of appellees, finding that neither Dr. Scroggins nor Prince George's Hospital Center had breached the standard of care.

### DISCUSSION

Appellant contends that the trial court erred in allowing Dr. Luethke, who had previously examined appellant at her request, to testify as an expert witness for appellees, over appellant's objection. In support of that contention, appellant advances four reasons why the doctor's testimony should have been excluded: First, as a "treating physician," Dr. Luethke

violated a fiduciary duty when he gave expert testimony against appellant. That duty, according to appellant, arose out of their physician-patient relationship. Second, "the probative value of [Dr. Luethke's] testimony ... was outweighed by its prejudicial effect." Third, allowing a treating physician to testify as an expert witness against a patient in a medical malpractice case, as Dr. Luethke was permitted to do, "threaten[s] the integrity of the judicial process." And fourth, "Dr. Luethke's testimony should have been excluded because he participated in *ex parte* contacts with [appellees'] attorneys." After carefully considering each ground, we remain unpersuaded that the trial court erred in permitting Dr. Luethke to testify as a defense expert.

Before addressing the merits of appellant's claims, we note that, in deciding whether to admit or exclude expert testimony, a trial judge is "vest[ed] ... with [a] wide latitude" of discretion. *Massie v. State,* 349 Md. 834, 850, 709 A.2d 1316 (1998). Indeed, that decision "will be reversed only if it is founded on an error of law or some serious mistake, or if the judge has abused his discretion." *Franch v. Ankney,* 341 Md. 350, 364, 670 A.2d 951 (1996) (citing *Hartless v. State,* 327 Md. 558, 576, 611 A.2d 581 (1992)). Even then a reversal is not warranted unless the erroneous admission of such evidence was prejudicial. The burden of showing that as well as error falls squarely on the complaining party. *Beahm v. Shortall,* 279 Md. 321, 330, 368 A.2d 1005 (1977).

### A Physician's Fiduciary Duty

We begin our analysis by observing that there is no physician-patient privilege in Maryland. "Communications made to a physician in his professional capacity by a patient are neither privileged under the common law of Maryland, nor have they been made so by statute." *Rubin v. Weissman,* 59 Md.App. 392, 401, 475 A.2d 1235 (1984) (citing *Robinson v. State,* 249 Md. 200, 221, 238 A.2d 875 (1968)); *see also O'Brien v. State,* 126 Md. 270, 284, 94 A. 1034 (1915). That has been the law of Maryland, and, except for a narrow exception

created by the General Assembly in the mental health area,[6] that remains the law of Maryland today.

Given the settled nature of Maryland law on that point, appellant takes a novel tact: conceding that no physician-patient privilege exists in Maryland law and that, even if one did, it was waived when appellant put her medical condition in issue, appellant claims Dr. Luethke's expert testimony should have nonetheless been barred because it violated, not a privilege, but a physician's fiduciary duty to his patient. According to appellant, when a treating physician "ceases to be a fact witness" and becomes an "expert witness on standards of care" the physician's testimony is "no longer an integral component of the fact-finding process" but "becomes part of the defense litigation strategy." Allowing such testimony, appellant claims, violates "[t]he fiduciary nature" of the physician-patient relationship, the protection of which requires a rule "precluding treating physicians from ever testifying as expert witnesses" against their patients.[7]

Before reaching that issue, however, we feel compelled to note that the record does not fully support the conclusion that Dr. Luethke was in fact appellant's "treating physician." Although we have not addressed this issue in this context before, we have considered the question of what is a "treating physician" in the context of determining when a patient's state-

---

6. Courts and Judicial Proceedings § 9–109 of the Maryland Code Annotated creates a limited privilege for patient-psychiatrist and patient-psychologist communications; § 9–109.1 creates a privilege for communications between a client and a psychiatric-mental health nursing specialist; and § 9–121 creates a privilege for communications between a licensed social worker and a client. Md.Code Ann. (1973, 1998 Repl.Vol., 2000 Cum.Supp.), §§ 9–101, 9–109.1, and 9–121 of the Cts. & Jud. Proc. Article.

7. Much of the language appellant employs and a significant portion of the argument she espouses in support of that proposition can be found in the dissenting opinion of the Honorable Charles W. Johnson in *Carson v. Fine*, 123 Wash.2d 206, 867 P.2d 610 (1994), which, as a result of an apparent oversight, was not cited in appellant's brief. As interesting and thoughtful as that dissent is for the proposition that a treating physician has a fiduciary duty not to testify against a patient, we respectfully disagree.

ments to his or her doctor are admissible as an exception to the rule against hearsay.

■ In *Low v. State*, 119 Md.App. 413, 705 A.2d 67 (1998), the issue before us was whether a physician was a "treating" or "examining" physician for the purpose of determining whether statements made to that doctor by a twelve-year-old victim of sexual abuse were substantive evidence under Maryland Rule 5–803. Subsection (b)(4) [8] of that Rule permits the admission of "[s]tatements made for purposes of medical treatment or medical diagnosis in contemplation of treatment" as substantive evidence.[9]

In *Low*, we held that because the doctor saw the victim "for the sole purpose of examining and detecting child abuse," she was not a treating physician under Rule 5–803(b)(4) and therefore any statements made to her by the victim were not admissible as substantive evidence under that exception to the hearsay rule. *Id.* at 425, 705 A.2d 67. In reaching that result, we stressed that "the declarant's subjective purpose in making any statements to a physician is of vital importance in determining whether to admit those statements as substantive

---

**8.** The full text of Maryland Rule 5–803(b)(4) is as follows:

Statements made for purposes of medical treatment or medical diagnosis in contemplation of treatment and describing medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external sources thereof insofar as reasonably pertinent to treatment or diagnosis in contemplation of treatment.

**9.** "Statements by a patient to a physician consulted for diagnosis and treatment are admissible under the theory that someone who goes to a doctor for diagnosis and treatment is not going to supply false information." *Choi v. State*, 134 Md.App. 311, 321, 759 A.2d 1156 (2000). Thus, "statements of medical history, made by a patient to a treating medical practitioner for the purposes of treatment, may be admitted as substantive evidence through the medical witness." *Id.* at 320, 759 A.2d 1156. However, "if the medical practitioner is engaged only to render an expert opinion, and not for purposes of treatment, statements of history related by the patient are admissible through that witness for the limited purpose of explaining the basis for the expert's opinion." *Id.*

evidence even though hearsay." *Id.* (citing *In re Rachel T.,* 77 Md.App. 20, 34, 549 A.2d 27 (1988)).

In determining the purpose of the victim (or declarant) we took into consideration that there was "no evidence that [the declarant's] subjective intent when being examined and interviewed by [the doctor] was to communicate potential ailments or abuse in hopes of further treatment." *Id.* We further noted that the declarant had been referred for only a medical examination, that she presumably had never been treated by that physician before, and that there was no indication that she would ever be again. *Id.* at 421, 705 A.2d 67.

As in *Low,* appellant met with Dr. Luethke on only one occasion and, as in *Low,* it was for a medical evaluation. At the conclusion of her examination, appellant asked the doctor whether he could support her claim of negligence against appellees. He indicated that he could not, and she did not return for further treatment. At trial, Dr. Luethke testified that he "came away [from their consultation] with the distinct impression that she was hoping for someone ... to support her claim of negligence." Because appellant did not testify on this point—as the issue of her "subjective intent" was not raised by either party before or during trial—we do not know what explanation she would have given at trial for seeing Dr. Luethke.

As this brief summary of the testimony on this issue reveals, the evidence is, to be sure, ambiguous as to whether Dr. Luethke was a "treating" physician. As appellant's entire argument for finding that Dr. Luethke had breached a fiduciary duty by testifying against appellant is based on the assumption that he was a "treating" physician, this issue would not be, under a different set of circumstances, inconsequential. But because we find no fiduciary duty in Maryland that would prohibit a physician, treating or otherwise, from giving expert testimony against a patient, we do not reach that issue here.

In support of her argument that Dr. Luethke should not have been permitted to testify, appellant cites three Maryland cases, Maryland's Confidentiality of Medical Records Act, and

several decisions rendered by trial and intermediate appellate courts in other jurisdictions. The Maryland cases and statute cited by appellant, however, lend no support to the proposition that a treating physician should not be permitted to testify as a medical expert against a patient, and the out-of-state cases relied upon by appellant run counter to Maryland law.

The first Maryland case that appellant relies on is *Lemon v. Stewart*, 111 Md.App. 511, 682 A.2d 1177 (1996). In *Lemon*, the issue before us was whether a health care provider has "a duty to inform the members of a patient's extended family . . . of the patient's positive HIV/AIDS status." *Id.* at 514, 682 A.2d 1177. In that case, we held that there is no such duty, *id.* at 524, 682 A.2d 1177, and explained that "the relationship between a health care provider and its patient is one of trust and confidence and that, absent a statute permitting otherwise, the patient has a right to assume that his medical condition will not voluntarily be disclosed by the provider to other persons without the patient's consent." *Id.* at 525, 682 A.2d 1177.

Appellant's reliance on *Lemon* is manifestly misplaced. In *Lemon*, we reasoned that "[t]o recognize a common-law duty on the part of health care providers to inform persons such as appellants would not only be thoroughly impractical but would constitute a wholly unwarranted invasion of the patient's privacy." *Id.* at 524, 682 A.2d 1177. In other words, we found that there was "a compelling substantive public policy reason not to impose it—the privacy rights of the patient." *Id.* Our statement that "the relationship between a health care provider and its patient is one of trust and confidence" refers only to the unwarranted disclosure of confidential patient information and was not intended, as appellant claims, to preclude a physician from giving expert testimony against a patient who has waived his right to privacy by placing his medical condition in issue. In short, unlike in *Lemon*, there is no right of privacy at stake here. *Lemon*, therefore, lends no support to appellant's contention that "[b]y participating in the defense's case, a treating physician necessarily betrays his or her patient's confidence."

Appellant cites two other Maryland cases to buttress her "fiduciary duty" claim. They are *Dr. K. v. State Board of Physician Quality Assurance*, 98 Md.App. 103, 632 A.2d 453 (1993), and *Suburban Trust Co. v. Waller*, 44 Md.App. 335, 408 A.2d 758 (1979). Neither one provides any support to the proposition for which they are cited. In *Dr. K*, we held that a patient's "constitutional right to privacy in her medical records [was] ... outweighed by the State's compelling interest in obtaining those records for the purpose of investigating possible disciplinary action against Dr. K." *Id.* at 122, 632 A.2d 453. In *Suburban Trust*, we stated that "a bank depositor in this State has a right to expect that the bank will, to the extent permitted by law, treat as confidential, all information regarding his account and any transaction relating thereto." *Id.* at 344, 408 A.2d 758. "Accordingly," we held there "that, absent compulsion by law, a bank may not make any disclosures concerning a depositor's account without the express or implied consent of the depositor." *Id.*

Neither *Dr. K* nor *Suburban Trust* bolsters appellant's claim. In both of those cases, as in *Lemon*, this Court found a confidential relationship but only in the context of a right to privacy, where that right had not been waived, expressly or impliedly, by the party invoking it. Because none of the Maryland cases cited by appellant are relevant to the issue now before us, they serve only to underscore the unprecedented nature of appellant's claim.

█ Appellant next invokes Maryland's Confidentiality of Medical Records Act ("Act"),[10] claiming to find support in section 4–302(a) of the Act for prohibiting a treating physician from testifying as an expert witness against a patient. That section provides that "[a] health care provider shall: (1) Keep the medical record of a patient or recipient confidential; and (2) Disclose the medical record only: (i) As provided by this subtitle; or (ii) As otherwise provided by law." Md.Code Ann.

---

**10.** The Act is codified in part as Md.Code Ann. (1982, 2000 Repl.Vol., 2000 Cum.Supp.), §§ 4–301 to 4–309 of the Health–Gen. I Article.

(1982, 2000 Repl.Vol., 2000 Cum.Supp.), § 4–302(a) of the Health–Gen. I Article. An express exception to the confidentiality established by that Act, however, is when a patient puts his or her medical condition at issue in a civil action. Then, a health care provider must disclose, in accordance with § 4–306(b)(3), all medical information, that forms the basis of the patient's claim, regardless of whether the patient consents to that disclosure.[11]

Notwithstanding this unambiguous expression of the legislature's intent not to shield information of this nature from disclosure, appellant argues that the legislature, by "crafting the [Act] so that confidentiality is the rule and disclosure the exception, plainly recognized the important public policies underlying the physician-patient relationship." Whatever the merits of this pronouncement, the Act clearly does not preclude treating physicians from testifying as experts against their patients.

Ultimately, appellant turns to cases from other jurisdictions to bolster her claim of the existence of a fiduciary duty that bars adverse expert testimony by a treating physician. These cases, however, are plainly at variance with Maryland law.

The first case appellant cites is *Piller v. Kovarsky,* 194 N.J.Super. 392, 476 A.2d 1279 (Law Div.1984). In that case, the Superior Court of New Jersey, Law Division, held that "the fiduciary nature of the [physician-patient] relationship should preclude a physician from testifying against his patient as a liability expert, at least in a medical malpractice action involving the very condition for which the physician has treated the patient." *Id.* at 1282. In support of that conclusion,

---

11. Section 4–306(b) of the Act states in part that:
 A health care provider shall disclose a medical record without the authorization of a person in interest:
 . . . .
 (3) To a health care provider or the provider's insurer or legal counsel, all information in a medical record relating to a patient or recipient's health, health care, or treatment which forms the basis for the issues of a claim in a civil action initiated by the patient, recipient, or person in interest.

the New Jersey court cited a Pennsylvania case, *Alexander v. Knight,* 197 Pa.Super. 79, 177 A.2d 142 (1962), a case upon which appellant now heavily relies. *Piller,* 476 A.2d at 1281.

In *Alexander,* the Superior Court of Pennsylvania, an intermediate appellate court, declared that physicians "stand in a confidential or fiduciary capacity as to their patients." *Alexander,* 177 A.2d at 146. In that regard, the court continued, "[t]hey owe their patients ... a duty of total care; that includes and comprehends a duty to aid the patient in litigation, to render reports when necessary and to attend court when needed." *Id.* That duty also includes, the court asserted, "a duty to refuse affirmative assistance to the patient's antagonist in litigation." *Id.*

Unfortunately for appellant, this Court flatly rejected that reasoning in *Stevens v. Barnhart,* 45 Md.App. 289, 412 A.2d 1292 (1980). In that medical malpractice case, the deceased plaintiff was allegedly a former patient of a partner of the defense's medical expert and had allegedly been treated by that partner for an ailment unrelated to the issues before the trial court. Stevens, the personal representative of the plaintiff's estate, claimed that the trial court " 'erred in refusing to advise' " the defense's medical expert that, in testifying against the deceased plaintiff, " 'he might well be violating his duty to a patient of his partnership.' " *Id.* at 294, 412 A.2d 1292.

To bolster that claim, Stevens cited the foregoing statements from *Alexander v. Knight, supra.* Declaring that that language does not "represent[ ] the law of Maryland," this Court stated that " '[c]ommunications made to a physician in his professional capacity are not privileged under the common law of Maryland, nor, with some exceptions in the case of psychiatrists, have they been made so by statute.' " *Id.* at 295, 412 A.2d 1292 (quoting *Franklin v. State,* 8 Md.App. 134, 141, 258 A.2d 767 (1969)). *See also Green v. Otenasek,* 267 Md. 9, 15, 296 A.2d 597 (1972) (declaring that the *Alexander* statement "hardly rises to the level of dicta"). Admittedly, our rejection in that case of a physician's duty "to refuse

affirmative assistance to the patient's antagonist in litigation" appears to rest solely on the ground that Maryland does not have a physician-patient privilege outside of the mental health field. We reaffirm that holding but do so on the ground that a physician, treating or otherwise, has no fiduciary duty to refuse to give expert medical testimony adverse to his patient's legal interests.

Nor is Maryland alone in rejecting such a duty. *See, e.g., Torres v. Superior Court, County of San Diego,* 221 Cal. App.3d 181, 270 Cal.Rptr. 401 (1990); *Richbow v. District of Columbia,* 600 A.2d 1063 (D.C.1991); *Orr v. Sievert,* 162 Ga.App. 677, 292 S.E.2d 548 (1982); *Cates v. Wilson,* 321 N.C. 1, 361 S.E.2d 734 (1987); *Trujillo v. Puro,* 101 N.M. 408, 683 P.2d 963 (Ct.App.1984); *Carson v. Fine,* 123 Wash.2d 206, 867 P.2d 610 (1994). In *Cates v. Wilson,* 321 N.C. 1, 361 S.E.2d 734 (1987), for example, the Supreme Court of North Carolina held that "[o]nce a plaintiff waives his right to prohibit disclosures of confidences by his physicians he may not assert the physician-patient privilege to prevent them from testifying as experts for his opponent." *Id.* at 740. The court reasoned that "[w]hen a patient dissolves the fiduciary relationship with his physician by disclosing or permitting disclosure of details of their consultations, he should not, in fairness, be allowed to prevent the physician from stating an opinion which might aid the trier of fact in assessing the merits of the patient's case." *Id.* at 743. The court noted that "to hold otherwise would enable patients ... to suppress the truth in litigation." *Id.*

In *Richbow v. District of Columbia,* 600 A.2d 1063 (D.C. 1991), the District of Columbia Court of Appeals reached a similar conclusion, stating that "there is no satisfactory basis for, on the one hand, conceding that a physician may testify about the facts of his patient's treatment but, on the other, disputing the admissibility of an expert opinion formed in the course of, or on the basis of, that treatment (even though rendered by the physician as a paid expert)." *Id.* at 1069.

In *Torres v. Superior Court, County of San Diego,* 221 Cal.App.3d 181, 184, 270 Cal.Rptr. 401 (1990), the Court of

Appeal of California for the Fourth Appellate District also addressed the issue of "whether a nonparty physician who treated a malpractice claimant may testify as an expert for the defense." *Id.* at 184, 270 Cal.Rptr. 401. In that case, the plaintiff, Torres, filed a motion to prevent his former treating physician from "testifying as a defense expert witness on the medical negligence standard of care employed by subsequent treating physicians." *Id.* at 183, 270 Cal.Rptr. 401. As grounds for that motion, Torres claimed that a doctor owes a patient "a fiduciary duty to refuse affirmative assistance to his patient's adversary in litigation." *Id.* at 184, 270 Cal.Rptr. 401. The court nonetheless concluded that "the better rule [was] to permit [Torres' doctor] to testify for the defense." *Id.* at 187, 270 Cal.Rptr. 401.

Similarly, in *Carson v. Fine,* 123 Wash.2d 206, 867 P.2d 610 (1994), the issue before the Supreme Court of Washington was the "admissibility of adverse opinion evidence offered by a treating physician against the plaintiff, his former patient in a malpractice action filed against another physician." *Id.* at 613. That court held that "a plaintiff's waiver of the physician-patient privilege extends to all knowledge possessed by the plaintiff's doctors, be it fact or opinion." *Id.* at 616. The court reasoned that "[t]here is no basis in reason, the common law, or in statutory law to draw a distinction between the types of testimony a treating physician may offer once the physician-patient privilege has been waived." *Id.* at 616–17.

Finally, in *Orr v. Sievert,* 162 Ga.App. 677, 292 S.E.2d 548 (1982), the Court of Appeals of Georgia stated that "we discern no restraint upon a doctor who has entered into a patient-doctor relationship and treated a patient from rendering an appropriate opinion as to the nature and quality of treatment afforded the same patient for the same course of illness by another physician." *Id.* at 550. *See also Trujillo v. Puro,* 101 N.M. 408, 683 P.2d 963, 966 (Ct.App.1984) (court agreed with defendant's assertion that "a physician who has previously treated a plaintiff in an action alleging negligence or malpractice is not precluded from testifying as an expert for the defendant").

## Probative Value v. Prejudicial Effect

 Appellant next claims that the trial court should have excluded Dr. Luethke's testimony because its probative value was substantially outweighed by its prejudicial effect. Specifically, appellant asserts that there is an "unfair prejudice that inherently derives from the physician's breech [sic] of trust in testifying as part of the adversary party's team." Such testimony, appellant explains, is unfairly prejudicial as "[j]urors are inclined to give great weight to a treating physician's testimony because they recognize the special nature of a physician-patient relationship." Thus, appellant maintains that the trial court erred in permitting Dr. Luethke to testify as a defense expert and thereby exposing her to unfair prejudice.

 Maryland Rule 5–403 provides in part that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." The determination of whether relevant evidence should be excluded because its probative value is substantially outweighed by its prejudicial effect is " 'committed to the considerable and sound discretion of the trial court' " and will not be set aside unless " 'there is a clear showing of an abuse of discretion.' " *Dorsey v. Nold,* 130 Md.App. 237, 263, 745 A.2d 1119 (2000) (quoting *Smallwood v. Bradford,* 352 Md. 8, 27, 720 A.2d 586 (1998)), *rev'd on other grounds, Dorsey v. Nold,* 362 Md. 241, 765 A.2d 79 (2001). No such abuse of discretion, however, occurred in the instant case.

In *Rubin v. Weissman,* 59 Md.App. 392, 475 A.2d 1235 (1984), we reviewed the question of whether the lower court had erred in permitting the defendants to discover and use the expert testimony of two physicians who had previously treated the plaintiff in a personal injury case. *Id.* at 399, 475 A.2d 1235. Although "both of these doctors had been consulted by [the plaintiff] for treatment," she had "not designated [them] to testify as experts at trial." *Id.* at 400, 475 A.2d 1235. In concluding that the trial court had not erred, we noted that "[t]he Court of Appeals has recognized that where one party

retains an expert witness, but does not call him at trial, the other party may not only call the same witness to testify in his behalf but, within the discretion of the trial judge, may disclose the initial employment by his adversary." *Id.* at 403, 475 A.2d 1235. (citing *City of Baltimore v. Zell,* 279 Md. 23, 367 A.2d 14 (1977); *Levitsky v. Prince George's County,* 50 Md.App. 484, 439 A.2d 600 (1982)).

As in *Rubin,* appellant did not name Dr. Luethke as an expert witness. In fact, she never retained him as an expert witness in the first place. Thus, the trial court acted well within its discretion in permitting appellees to use Dr. Luethke as a defense expert and to disclose his previous contact with appellant.

### Integrity Of The Judicial Process

 Appellant further contends that Dr. Luethke's testimony should have been excluded because it threatened the "integrity of the judicial process." In support of that claim, appellant relies on the decisions of two federal district courts: *W.R. Grace & Co. v. Gracecare, Inc.,* 152 F.R.D. 61 (D.Md. 1993), and *Cordy v. Sherwin–Williams Co.,* 156 F.R.D. 575 (D.N.J.1994).

In *W.R. Grace,* the corporate counsel for plaintiff, W.R. Grace, telephoned David B. Allen, a well-known trademark attorney, " 'to retain him to render advice to Grace in connection with [pending] litigation and in connection with a trademark application.' " *Id.* at 63. During the course of that telephone conversation, corporate counsel discussed with Allen " 'the marks at issue, some of the issues of trademark law that had arisen in the case, including the possibility and appropriateness of expert testimony on legal issues, and some of the arguments defendants were making.' " *Id.* Also, " '[t]he discussion included a disclosure of some of' " lead outside counsel's and corporate counsel's thoughts " 'on certain issues in the case.' " *Id.* Corporate counsel believed he had established an " 'attorney-client relationship ... between Mr. Allen and Grace' " and, in fact, Allen billed for that conversation as well

as a second telephone conversation and the research he was then asked to perform. *Id.*

Defense counsel, however, subsequently contacted Allen and retained him as a defense expert. *Id.* at 64. The plaintiffs then filed a motion to disqualify Allen as an expert witness. *Id.* at 63. In granting that motion, the district court stated that "[t]he appropriate standard of review for disqualification motions directed toward experts is two-fold:"

"the [c]ourt must determine 'whether the attorney or client acted reasonably in assuming that a confidential relationship of some sort existed [with the expert], and, if so, whether the relationship developed into a matter sufficiently substantial to make disqualification or some other judicial remedy appropriate.' "

*Id.* at 64 (quoting *Palmer v. Ozbek,* 144 F.R.D. 66, 67 (D.Md. 1992)) (quoting *Paul v. Rawlings Sporting Goods Co.,* 123 F.R.D. 271, 278 (S.D.Ohio 1988)).

The court declared that "[a]n attorney may not represent a client against a former client if the subject matter of the litigation is substantially related." *Id.* at 65. "A substantial relationship is presumed," the court continued, "where there is 'a reasonable probability that confidences were disclosed' which could be used adversely later." *Id.* (quoting *Stitz v. Bethlehem Steel Corp.,* 650 F.Supp. 914, 916 (1987)). In applying that rule to disqualify Mr. Allen, the court observed that it was "[his] status as an attorney which counsels resolving all doubts in favor of disqualification to avoid the appearance of impropriety and to preserve the integrity of this proceeding." *Id.* at 66.

Needless to say, the holding of that court in *W.R. Grace* is not binding upon this Court. In that case, moreover, the district court stressed the limited nature of its holding by observing that it was the expert's "status as an attorney" that "counsel[ed] resolving all doubts in favor of disqualification." *Id.* By arguing that the reasoning that led to a disqualification of a legal expert in *W.R. Grace* should now be applied to a medical expert in the instant case, appellant would have us

give a much broader reading of the holding of that case than the district court ever intended.

In *Cordy* the plaintiff was injured while riding a bicycle on a railroad crossing allegedly owned by the defendant. *Id.* at 576. The plaintiff retained a forensic engineer specializing in "accidents involving bicycles." *Id.* Among other things, the expert reviewed a "three ring binder containing the investigation conducted by plaintiff's counsel." *Id.* at 577. That binder included "a cover letter with counsel's impression of the case, a police report, witness interview, summary memorandum photographs, and an Engineering Report of another expert." *Id.* The expert billed plaintiff's counsel for twenty-seven hours of work and "render[ed] at least one oral opinion to Plaintiff's firm concerning the cause of the accident." *Id.* The expert subsequently resigned and returned plaintiff's retainer. *Id.* Sometime after that, the defendant contacted the expert and retained him as a defense expert. *Id.* at 578–79. The plaintiff then moved to disqualify him as an expert. *Id.* at 576. In considering the plaintiff's motion to disqualify, the court followed a two-step analysis: "First, was it objectively reasonable for the first party who retained the expert to believe that a confidential relationship existed? Second, did that party disclose any confidential information to the expert?" *Id.* at 580 (citing *Paul,* 123 F.R.D. at 279).

Ultimately, the court granted the plaintiff's motion, finding that the plaintiff had retained the forensic engineer as an expert, that the plaintiff had reasonably assumed that a confidential relationship existed, and that confidential information was disclosed. *Id.* at 581–83. The court went on to state that this was " 'a clear case for disqualification' " because the forensic engineer " 'was previously retained as an expert by the adverse party.' " *Id.* at 582 (quoting *Wang Labs. Inc. v. Toshiba Corp.,* 762 F.Supp. 1246, 1248 (E.D.Va.1991)).

The instant case, however, is distinguishable. Dr. Luethke was not "previously retained as an expert by the adverse party." Moreover, unlike the expert in *Cordy,* who was given a substantial amount of confidential information about plain-

tiff's case, Dr. Luethke was given only a bare bones medical history and description of appellant's claim. Finally, having placed her medical condition at issue, appellant had no reason to believe that the results of Dr. Luethke's examination would be kept confidential.

### *Ex parte* Contacts

 Appellant claims that Dr. Luethke's testimony should have been excluded because he participated in *"ex parte"* contacts with attorneys for appellees. This claim, however, has not been preserved for our review.

 Maryland Rule 8–131 states that, "[o]rdinarily, the appellate court will not decide any . . . issue unless it plainly appears by the record to have been raised in or decided by the trial court." Md. Rule 8–131(a). "The clear meaning of this Rule is that no unpreserved issue may serve as the basis for reversal." *Harwood v. Johns Hopkins Univ.*, 130 Md.App. 476, 492, 747 A.2d 205 (2000) (citing *Beeman v. Department of Health & Mental Hygiene*, 107 Md.App. 122, 159, 666 A.2d 1314 (1995)). In the instant case, the issue of *"ex parte* contacts" was not "raised in or decided by the trial court." No request was ever made by appellant that Dr. Luethke's testimony be excluded because he had had *"ex parte* contacts" with defense counsel.

In any event, in support of her contention, appellant relies on *Petrillo v. Syntex Lab., Inc.*, 148 Ill.App.3d 581, 102 Ill.Dec. 172, 499 N.E.2d 952 (1986). In that case, a defense attorney "challeng[ed] the propriety of a trial court's order finding him in contempt of court" when he "notified the trial court that he would not comply with the court's order barring him from engaging in private, *ex parte* conferences with the plaintiffs' treating physicians." *Id.* at 954. The Illinois court defined *"ex parte* contacts" as "any discussion that defense counsel has with a plaintiff's treating physician which is not pursuant to the authorized methods of discovery." *Id.* at 954 n. 1. After a comprehensive discussion of the nature of the physician-patient relationship, it found that *ex parte* contacts "jeopardize

the sanctity of the physician-patient relationship and, therefore, [were] prohibited as against public policy." *Id.* at 957.

Appellant, however, does not cite any specific instances of so called "*ex parte* contacts" between appellees and Dr. Luethke. Instead, appellant asks us to assume such contacts occurred because defense counsel knew what Dr. Luethke's testimony would be without deposing him.

■■■ That information, we note, could have been obtained by other legitimate discovery tools. Moreover, Rule 4.2 of the Maryland Rules of Professional Conduct bars only unconsented to *ex parte* contacts between a lawyer and a party represented by another lawyer: That rule provides that, "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." There is, however, no such prohibition in Maryland against what appellant describes as "*ex parte* contacts" between a lawyer and the treating physician of an adverse party who has placed her medical condition in issue.

### Jury Instructions

Appellant contends that the trial court committed several errors in instructing the jury. Specifically, appellant argues that the trial court's jury instructions confused the concepts of intervening cause and superseding cause, and that it erred by using the word "presumption" in describing the standard of care for health care providers. Appellant also asserts that the trial court erred in failing to instruct the jury as to *res ipsa loquitur* as well as the "borrowed servant" and "captain of the ship" doctrines. Unfortunately for appellant, her objections were never preserved for appeal.

Maryland Rule 2–520(e) states in part:

No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly

the matter to which the party objects and the grounds of the objection.

 This rule requires "parties to be precise in stating objections to jury instructions at trial, for the plain reason that the trial court has no opportunity to correct or amplify the instructions for the benefit of the jury if the judge is not informed of the exact nature and grounds of the objection." *See Fearnow v. Chesapeake & Potomac Tel. Co. of Maryland,* 342 Md. 363, 378, 676 A.2d 65 (1996) and cases there cited. In other words, to assure that the trial court has an opportunity to correct its jury instructions, the objecting party must "clearly state . . . the nature of the objection and the reasoning and law on which the objection is grounded." *Id.* If the objecting party fails to " 'fully comply with the requirements of the rule . . . there is nothing for us to consider on an appeal.' " *Black v. Leatherwood Motor Coach Corp.,* 92 Md. App. 27, 34, 606 A.2d 295 (1992) (quoting *Casey v. Roman Catholic Archbishop of Baltimore,* 217 Md. 595, 612, 143 A.2d 627 (1958)). Indeed, such objections are not preserved for review when an appellant "merely makes reference to the instruction number without further expounding upon the actual ground of the objection." *Levitsky v. Prince George's County,* 50 Md.App. 484, 496, 439 A.2d 600 (1982)(interpreting the precursor to Rule 2–520(e), former Maryland Rule 554(d)).

 In objecting to the jury instructions, appellant only referred to instruction numbers and gave no specific grounds. In short, she did not state distinctly the matters to which she objected, nor the reasons for her objections. After the trial court instructed the jury, the following exchange took place:

[THE COURT]: I'll take the plaintiff first. First of all, is there anything else you want me to tell the jury?

[APPELLANT'S COUNSEL]: No, your Honor, not to tell the jury.

[THE COURT]: Not to tell them?

[APPELLANT'S COUNSEL]: No.

\* \* \*

[THE COURT]: But [do] you have [any] exceptions?

[APPELLANT'S COUNSEL]: Yes, I do.

[THE COURT]: Good.

[APPELLANT'S COUNSEL]: The instructions I will except to, Your Honor, will be the standard of care for health care providers. I take exception to that, which I believe is the tenth instruction-

[THE COURT]: Uh-huh.

[APPELLANT'S COUNSEL]: ... The next exception will be the standard of care for physicians which was the eleventh instruction-

[THE COURT]: Uh-huh.

[APPELLANT'S COUNSEL]: ... And the next would be the jury instruction on proximate slash contrary cause which will be the twelfth instruction which you gave.

The next that I will except to is causal connection which I believe was the thirteenth instruction which you gave.

The next would be the mitigation of damages which will be the seventh instruction I believe you gave. I will except to that, Your Honor. Those will be the specific instructions that I will except to. In the whole I thought the instructions were more favorable to the defendants than the plaintiff as well.

[THE COURT]: Thank you.

Appellant made no further effort to clarify or explain her objections to the court's instructions. Indeed, there is no evidence that the arguments appellant now makes on appeal regarding the court's confusing intervening and superseding cause instruction, or its use of the word "presumption" in describing the standard of care for health care providers, were ever brought to the attention of the trial court. Consequently, the trial court was "not afforded a fair opportunity ... to correct any error of law and thus avoid a reversal and another trial." *Fearnow*, 342 Md. at 380, 676 A.2d 65. Nor did appellant "substantially [comply]" with Rule 2–520(e), as there

is no indication that the trial court understood the "precise point" of appellant's objections despite her failure to state grounds for them. *Sergeant Co. v. Pickett,* 283 Md. 284, 289–90, 388 A.2d 543 (1978). Thus, appellant's assertions that the trial court erred by confusing the concepts of intervening cause and superseding cause in its jury instructions, and by using the word "presumption" in describing the standard of care for health care providers have not been preserved for our review.

■■■ Appellant also contends that the trial court erred in failing to instruct the jury as to *res ipsa loquitur* as well as the borrowed servant and captain of the ship doctrines. Because appellant did not object, "on the record promptly after the court instruct[ed] the jury," she may not now "assign as error the ... failure to give [these] instruction[s]." Md. Rule 2–520(e). Although appellant argued the relevance of these doctrines in her motion for judgment at the close of the case and in her motion for judgment notwithstanding the verdict/motion for new trial, there is no evidence that she ever requested jury instructions on them. Indeed, after instructing the jury, the trial court asked appellant's counsel three times whether there was anything else he wanted told to the jury. Each time, he declined to request any additional instructions. Because appellant did not object to the trial court's failure to give these instructions and because there is no evidence that such jury instructions were requested, appellant's claims have not been preserved for review.

■■■ Even if appellant's arguments relating to captain of the ship, borrowed servant, and *res ipsa loquitur* were preserved for our consideration, we would find no error in the trial court's decision not to instruct the jury as to these doctrines. In reviewing a trial court's denial of requested jury instructions, we must determine: "(1) [whether] the requested instruction was a correct exposition of the law; (2) [whether] that law was applicable in light of the evidence presented to the jury; and (3) [whether] the requested instruction was fairly covered by the instructions actually given." *Jacobs v.*

*Flynn,* 131 Md.App. 342, 384, 749 A.2d 174 (2000) (citing *Wegad v. Howard St. Jewelers, Inc.,* 326 Md. 409, 414, 605 A.2d 123 (1992)). " 'If any one part of the test is not met, we will affirm the trial court's denial of the request for instruction.' " *Hill v. Wilson,* 134 Md.App. 472, 496, 760 A.2d 294 (2000) (quoting *Fearnow,* 342 Md. at 385, 676 A.2d 65). Because the doctrines of captain of the ship, borrowed servant, and *res ipsa loquitur* were not "applicable in light of the evidence presented to the jury," the trial court correctly declined to instruct the jury as to these doctrines.

The "successful reliance on *res ipsa loquitur* requires proof of the following three components:

1. A casualty of a sort which usually does not occur in the absence of negligence.

2. Caused by an instrumentality within the defendant's exclusive control.

3. Under circumstances indicating that the casualty did not result from the act or omission of the plaintiff."

*Dover Elevator Co. v. Swann,* 334 Md. 231, 236–37, 638 A.2d 762 (1994) (citations and internal quotation marks omitted).

According to appellant, the trial court erred in declining to instruct the jury as to *res ipsa loquitur.* We disagree. As appellant failed to produce sufficient evidence that either appellee was in "exclusive control" of the vagrant needle, such an instruction could not have been appropriate.

A total of five people participated in appellant's surgery: Dr. Scroggins, an assisting surgeon, a scrub technician, and two circulating nurses. Dr. Scroggins testified that he was not responsible for needle counts and that after he finished using a microsurgical needle in the wound, it was passed on "to the scrub tech or to the nurse." Additionally, Nurse Mennich, an expert witness for appellant, testified that "[n]eedles are given on an exchange basis from the nurse to the scrub nurse." Moreover, Dr. Mead, appellant's other expert witness, admitted on cross-examination that he could not "say to a reasonable degree of medical probability how the needle

portion made its way to Mrs. Tulio's hand" or whether Dr. Scroggins had ever broken the needle. Furthermore, Dr. Luethke, appellees' expert, testified that in microsurgery, "we are talking about very small needles" and that there are "many ways that I can imagine how a microsurgical needle could ... find its way into an operative wound." Thus, there was no evidence that either appellee was in "exclusive control" of the "instrumentality" that allegedly caused appellant's injury.

 Moreover, the "application of *res ipsa loquitur* is not appropriate in a case which uses expert testimony to resolve complex issues of fact." *Dover Elevator Co.,* 334 Md. at 254, 638 A.2d 762. "In the strictest sense, *res ipsa loquitur* is limited to those instances where, certain criteria having been met, the trier of fact may draw an inference of negligence from the facts alone." *Orkin v. Holy Cross Hosp. of Silver Spring, Inc.,* 318 Md. 429, 431, 569 A.2d 207 (1990).

In the instant case, there was conflicting expert testimony as to whether leaving a microsurgical suture needle in the wound was a violation of the standard of care. In addition, there were conflicting expert opinions as to whether the leaving of such an object in the location where it was found caused appellant's injury. Thus, the jury could not have inferred negligence, without the assistance of expert testimony, from the mere fact that an injury occurred. Accordingly, the trial court did not err in finding *res ipsa loquitur* did not apply to the facts of this case.

Appellant also asserts that the trial court erred in not instructing the jury that appellee Dr. Scroggins could be vicariously liable for the negligence of the employees of appellee Prince George's Hospital Center under the "captain of the ship" and "borrowed servant" doctrines. As stated above, even if this issue had been preserved for review, we would find no error in the trial court's decision not to instruct on those doctrines.

 In *Franklin v. Gupta,* 81 Md.App. 345, 567 A.2d 524 (1990), we examined the purpose and scope of what "has

become popularly—and sometimes erroneously or misleading-ly—called the 'captain of the ship' doctrine." *Id.* at 366, 567 A.2d 524. In that case, we "reject[ed][the] 'captain of the ship' theory of liability," *id.* at 375, 567 A.2d 524, and stated that in Maryland the "correct doctrine to apply is the tradi-tional 'borrowed servant' rule." *Id.*

Under the borrowed servant doctrine, we explained that the trier of fact may find that a surgeon is liable for the negli-gence of another person's work or conduct in the operating room if the "evidence suffices to support a finding that the surgeon *in fact* had or exercised the right to control the details of [that] person's work." *Id.* In *Rivera v. Prince George's County Health Dep't,* 102 Md.App. 456, 481, 649 A.2d 1212 (1994), we stated that a borrower can be held liable for a servant's negligent acts, " *'where the work is not within the scope of the general employment of the servant' "* but rather " *'is the borrower's work.' "* *Id.* (quoting *Dippel v. Juliano,* 152 Md. 694, 699–700, 137 A. 514 (1927)). We further ex-plained that the borrowed servant doctrine is " 'ordinarily' " not applicable when there is only " 'the mere right to point out and direct the servant as to the details of the work and the manner of doing it.' " *Id.*

In the instant case, nurses employed by appellee Prince George's Hospital Center assisted Dr. Scroggins in appellant's procedure by, among other tasks, performing nee-dle counts. There was no evidence that Dr. Scroggins had the right or had attempted to control the details of the nurses' work. Dr. Mead, appellant's expert, testified that it was not Dr. Scroggins's responsibility to do needle counts at any time during appellant's procedure. Nurse Mennich, appellant's other expert witness, agreed. She testified that it was the responsibility of the operating room nurses to perform needle counts and to insure that those needle counts were correct. In addition, no evidence was adduced that the performance of needle counts was a unique requirement specifically ordered by Dr. Scroggins, and thus not "within the scope" of the

nurses "general employment" at Prince George's Hospital Center.

Because the "captain of the ship" doctrine no longer has any vitality in Maryland, and because there was no evidence that Dr. Scroggins in fact controlled the details of the nurse's work, the trial court did not err in declining to instruct the jury as to the captain of the ship or borrowed servant theories of liability. Moreover, even if the borrowed servant instruction should have been given, the failure of the trial court to do so was harmless error. That instruction renders the "borrower," (Dr. Scroggins) vicariously liable for the negligence of the "servants," (the nurses employed by Prince George's Hospital Center). Because the jury found that the Hospital Center (in other words, the nurses) was not negligent it could not then have found Dr. Scroggins vicariously liable for negligence that did not occur. *See Benik v. Hatcher*, 358 Md. 507, 537, 750 A.2d 10 (2000) ("It is well settled that a civil judgment will not be reversed unless the complaining party shows both error and prejudice.").

## JUDGMENT AFFIRMED.

## COSTS TO BE PAID BY APPELLANT.